**CITY OF SAN ANTONIO et al., Petitioners,**

v.

**TEXAS WATER COMMISSION et al.,
Respondents.**

No. A–10989.

Supreme Court of Texas.

Oct. 26, 1966.

Boyle, Wheeler, Gresham, Davis & Gregory, A. W. Worthy with above firm, Robert Sawtelle, Sam S. Wolf, City Atty., J. Bruce Aycock, Asst. City Atty., San Antonio, for petitioners.

Clark, Thomas, Harris, Denius & Winters, Austin, for respondent Central Power & Light Co.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, Stanton Stone, George C. Black and Roger Tyler, Asst. Attys. Gen., Austin, for Texas Water Commission.

Vinson, Elkins, Weems & Searls, Victor W. Bouldin, with above firm, Houston, for Guadalupe-Blanco River Authority.

Baker, Botts, Shepherd & Coates, John H. Sellingsloh, James G. Ulmer and Edward S. Howell, with above firm, Houston, for E. I. duPont and Union Carbide Corp.

Louis Saegert, City Atty., Seguin, for City of Seguin.

Frank B. Shepherd, City Atty., Cuero, for City of Cuero.

Howard Hartzog, Port Lavaca, for City of Port Lavaca.

Calvin E. Reidel, New Braunfels, for City of New Braunfels.

Gerald T. Bissett, Victoria, for Refugio County.

Kemper Williams, Jr., Fly, Cory, Moeller & Stevenson, Victoria, for City of Victoria.

SMITH, Justice.

This is an appeal by the City of San Antonio and the Water Works Board of Trustees of San Antonio from an affirmance by the Court of Civil Appeals of an adverse judgment in two consolidated suits against the Texas Water Commission and the Guadalupe-Blanco River Authority to set aside and vacate two orders of the Commission. The first order under attack, entered on July 5, 1957, granted an application by the Guadalupe-Blanco River Authority to appropriate water for municipal purposes from the Canyon Dam Reservoir in Comal County to the extent of 50,000 acre-feet per annum. The second order, entered the same day, denied an application by the City of San Antonio to appropriate 100,000 acre-feet of water annually from the same source for a like purpose. After trial the 98th District Court of Travis County, sitting without a jury, entered a judgment upholding the orders of the Commission. This judgment was affirmed by the Court of Civil Appeals. 392 S.W.2d 200. We affirm the judgments of the trial court and the Court of Civil Appeals.

On March 2, 1953, San Antonio tendered to the Board of Water Engineers a "presentation" pursuant to Article 7496,[1] Vernon's Annotated Texas Civil Statutes,[2] for the purpose of determining the feasibility of their participation in the cost and construction of the Canyon Dam Project, a United States Corps of Engineers project on the Guadalupe River in Comal County, and the right to appropriate certain unappropriated water which was to be impounded in the Canyon Dam Reservoir.

1. "Any person who desires to investigate the feasibility of any water appropriation or use of water in quantities greater than twenty thousand-acre feet storage or fifty second feet diversion, or for generation of two thousand hydro-electric horsepower and who has an organized engineering force adequate to expeditiously proceed with such investigation, shall, upon the filing of an application therefor presenting such facts duly verified to the board, have priority date from the time of filing such application should a permit thereafter be granted thereon. Such application, in addition to the requirements above stated, shall describe the contemplated project, its location and purpose, the quantity of water to be applied for by measure if known, and if not by statement as near as possible of the quantity of water necessary to the contemplated use.

"Before such presentation is filed same shall be presented to said board for examination.

"Such presentation shall not be filed unless first approved by the board as to extent and purpose, and the board may require, in addition to the requirements above specified, additional information to be submitted under oath in order to determine if same is filed in good faith for the purposes stated.

"A presentation is confined to a stated purpose and area and one reservoir or diversion site, and cannot be so filed as to cover more than a reasonable area.

"The presentation when approved and filed by the board and to the extent approved by the board shall be in effect for a period of six months from the date it is so filed by the board.

"If the person filing a presentation shall, during such period, have begun work and shall have prosecuted same with reasonable diligence, but requires more time than the six months period to complete same, then application may be made before the expiration of said period to the board for an extension of time thereon. Such application for the extension of time shall contain a statement of the work done and the reasons why more time is required therefor. The board shall consider same together with any opposition thereto filed, and may grant one or more extensions of time, provided the total time granted under a presentation shall not exceed a term of three years from the date same is first filed."

2. All statutory references hereinafter contained are to Vernon's Annotated Texas Civil Statutes.

755

In an order dated April 2, 1953, the Board refused to accept and file the presentation on the ground that Article 1434a specifically forbade withdrawal of water from the Guadalupe watershed. San Antonio then brought suit attacking the constitutionality of Article 1434a, and, on April 5, 1954, the Board accepted San Antonio's presentation conditioned on the outcome of the pending appeal in the aforementioned suit. On September 13, 1954, the Board granted San Antonio's request for an extension of time in which to make further study of the proposed project. This study was made at a cost of $239,272.74 with the conclusion in 1955 that the Canyon Dam Project was the most feasible source of water available to the City of San Antonio. Thereafter, on October 26, 1955, San Antonio's contention with regard to the unconstitutionality of Article 1434a was sustained in the case of Board of Water Engineers of State v. City of San Antonio, 155 Tex. 111, 283 S.W.2d 722 (1955).

On January 11, 1956, San Antonio filed with the Board one of the applications involved here, seeking a permit to appropriate 100,000 acre-feet per annum of water for municipal purposes from the Canyon Dam Reservoir. It was contemplated that the water sought to be appropriated would be removed from the Canyon Dam Reservoir in Comal County and transported by pipeline to the watershed of the San Antonio River in Bexar County.

On March 6, 1956, the Guadalupe-Blanco River Authority filed its Application No. 1964 seeking a permit to appropriate 102,-700 acre-feet of water per annum from the Canyon Dam Reservoir as follows: 50,000 acre-feet for municipal and domestic purposes; 32,000 acre-feet for manufacturing and industrial uses; and 20,000 acre-feet for irrigation.

The Board of Water Engineers, with the consent of all parties, consolidated both applications for a hearing which began on June 25, 1957, and continued through July

27, 1957. On July 5, 1958, the Board issued an order granting the application of GBRA to the extent of 50,000 acre-feet annually for municipal uses. On the same day, the Board issued an order denying the San Antonio application. In accordance with the order granting Guadalupe-Blanco River Authority's application on January 22, 1959, for municipal use, the Board issued Permit No. 1886 to Guadalupe-Blanco River Authority to the extent of 50,000 acre-feet per annum.

On September 23, 1957, the City of San Antonio and its Water Works Board of Trustees filed two appeals from the above-mentioned orders in the 98th District Court of Travis County, Texas, under Article 7477. One appeal was from the order of the board denying San Antonio's application, the other appeal was from the order of the board granting the Guadalupe-Blanco River Authority application to the extent of 50,000 acre-feet. The cities of New Braunfels, Seguin, Gonzales, Cuero and Victoria intervened in the case as did E. I. duPont de Nemours & Company, Union Carbide Corporation, Central Power and Light Company, and the counties of Calhoun and Refugio. All of the intervenors aligned themselves with the position taken by the Guadalupe-Blanco River Authority. Although both appeals were given individual docket numbers, they were consolidated for trial purposes, and on June 19, 1964, judgment was rendered upholding the action of the Board in denying San Antonio's application and in granting the Guadalupe-Blanco River Authority's application and subsequent permit to the extent of 50,000 acre-feet.

Pursuant to a request by this Court, the parties herein have briefed the effect, if any, upon the merits of this cause resulting from the adoption of the Water Resources Administration and Development Act (Acts 1965, 59th Leg. p. 587, ch. 297). This question will be discussed with regard to Guadalupe-Blanco River Authority's motion to dismiss, infra.

The Board of Water Engineers became the Texas Water Commission in 1962 and the Texas Water Rights Commission in 1965. This agency will be referred to as the Water Rights Commission or the Commission; the Guadalupe-Blanco River Authority will be referred to as the GBRA.

The City of San Antonio and the Water Works Board of Trustees of San Antonio are petitioners before this Court; the Water Rights Commission, GBRA, and the various intervenors are respondents.

*Motion to Dismiss*

After writ of error was granted by this Court, GBRA, joined by all of the respondents, filed a motion to dismiss San Antonio's application for writ of error alleging six separate grounds for dismissal. We will, at this juncture dispose of the motion insofar as it relates to the order denying the San Antonio application. For purposes of convenience, we have grouped the grounds for dismissal into three categories.

■ Under the first category, the respondents contend that San Antonio has failed to assign error to various findings of fact of the trial court; and, therefore, this Court has no jurisdiction to review these findings, each of which, standing alone, would justify and support the orders of the Commission. Having failed to assign error in this Court on several of these findings which support the Commission's orders, respondents contend that San Antonio has failed to invoke the jurisdiction of this Court to render effective relief. We disagree. In Southern Canal Co. v. State Board of Water Engineers, 159 Tex. 227, 318 S.W.2d 619 (1958), we held that appeals from orders of the State Board of Water Engineers (Water Rights Commission) were to be tried under the substantial evidence rule. Under the substantial evidence rule the issue to be decided and on which evidence is to be heard is the *reasonableness* of the Commission's order; this is a question of law and an appellate court cannot render its decision based upon facts

found by a trial court because the legal test of the *reasonableness* of an order of the Commission is whether it is reasonably supported by substantial evidence and not whether it is supported by a preponderance of the evidence. Furthermore, trial of fact issues by a judge or jury is avoided; it is the Commission's fact finding that is before the trial and appellate courts. Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420 (1946); Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198 (1949); Board of Firemen's Relief and Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W.2d 181 (1951); Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338 (1948). As was stated in Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 74, 131 S.W.2d 73, 82 (1939):

" * * * the court does not act as an administrative body to determine whether or not it would have reached the same fact conclusion that the Commission reached, but will consider only whether the action of the Commission in its determination of the facts is reasonably supported by substantial evidence."

GBRA's second ground for dismissal is that San Antonio is without justiciable interest and standing to complain of the order of the Commission granting GBRA's application and permit. This ground will be discussed later in this opinion in connection with San Antonio's contention that the order granting Permit No. 1886 to GBRA is void because in granting said permit the Commission delegated its exclusive authority to administer water rights to the GBRA.

■ The third ground for dismissal is that this controversy has become moot due to the recent declaration of State policy as found in the Water Resources Administration and Development Act of 1965. In particular, respondents contend that the provision in Section 3(b) of Article 8280–9 wherein the newly created Texas Water Development Board's power to formulate plans for interbasin transfer of surface

waters is restricted to those waters which will be surplus to the reasonably foreseeable water supply requirements within the basin of origin for the next fifty-year period, is a declaration of State policy, which, when "coupled with the lower court's holding that 'the Guadalupe is not a basin of surplus supply for planning purposes,' effectively precludes, as a matter of law, any possibility that San Antonio's application for a permit for the out-of-basin diversion of water from Canyon Reservoir could now be granted."

Again we disagree. The Water Resources Administration & Development Act of 1965, Acts 59th Leg., p. 587, Ch. 297, Codified as Title 128, Article 8280–9, as amended, was enacted as a comprehensive plan for determining the long-range water needs of this State. By its enactment the Texas Water Development Board was created and charged with the following duty: "the preparation, development, and formulation of a comprehensive State Water Plan for this state, including a definition and designation of river basins and watersheds as separate units for purposes of water development and inter-watershed transfers." Section 3(b) goes on to provide:

"However, the Board shall not prepare or formulate any plan which contemplates or results in the removal from the basin of origin of any surface water to some other river basin or area outside of such basin of origin if the water supply involved in such plan or project will be required to supply the reasonably foreseeable future water supply requirements for the next ensuing fifty-year period within the river basin of origin, except on a temporary, interim basis."

The next paragraph of Section 3(b) reads as follows:

"When formally adopted by the Board, the State Water Plan shall be a *flexible guide* to state policy for the development of water resources in this state. *The Texas Water Commission* or its successors shall take the Texas Water Plan into consideration in matters coming before the Commission *but need not be bound thereby.*" [Emphasis added.]

It is apparent that the prohibition of trans-basin diversion of surface water is directed solely at the "State Water Plan" to be formulated by the Texas Water Development Board and not the Water Rights Commission. This is reinforced by the further provision that after the Plan is adopted it shall be a "flexible guide" by which the Commission "need not be bound" but rather shall take "into consideration in matters coming before the Commission." This specific exclusion of the Water Rights Commission from the prohibiting mandate directed to the Water Development Board nullifies any contention that the "State policy" expressed therein renders this controversy moot. Accordingly, respondent's motion to dismiss the application for writ of error, insofar as it relates to the order of the Texas Water Rights Commission denying the application of the City of San Antonio to appropriate water, is overruled.

■ We hold that this Court has jurisdiction to consider the points presented by San Antonio complaining of the judgment of the trial court in upholding the order of the Texas Water Rights Commission denying its application to appropriate water for municipal purposes from Canyon Dam Reservoir to Comal County.

Preliminary to consideration of this phase of the case on its merits we point out that in the trial court San Antonio's position was that because they had filed a presentation and application for a permit before the filing of an application by GBRA, San Antonio was entitled, as a matter of law, to any water determined by the Commission to be unappropriated. This contention is brought forward and will be discussed later in the opinion under our discussion of the Wagstaff Act.

*Substantial Evidence*

San Antonio attacks both orders of the Commission on the ground that each order is not supported by substantial evidence. As previously stated, the legal test of the reasonableness of an order of an administrative agency such as the Water Rights Commission is whether or not such order is "reasonably supported by substantial evidence." Southern Canal Co. v. State Board of Water Engineers, supra; State Board of Water Engineers v. Colorado River Municipal Water District, 152 Tex. 77, 254 S.W.2d 369, 372 (1953). When, as in this case, an appeal is governed by the substantial evidence rule, the orders of the Water Rights Commission are presumed to be legal and valid, and the burden is on the party appealing from the Commission's order to show that the orders are not reasonably supported by substantial evidence. Therefore, we must determine if San Antonio has sustained the burden of showing that the orders appealed from were not supported by substantial evidence. In making this determination we cannot substitute our discretion for that committed to the Commission by the legislature. Furthermore, "[t]he record is to be considered as a whole; and being a question of law, it is for this court to determine what is to constitute such evidence." Railroad Commission of Texas v. Manziel, 361 S.W.2d 560, 565, 93 A.L.R.2d 432 (Tex.1962); Gibralter Savings & Loan Ass'n v. Falkner, 371 S.W.2d 548 (Tex.1963) and authorities cited therein; see also Griffin, "The Growing Substantial Evidence Rule," 21 Tex.Bar J. 721 (1958).

San Antonio's application for a permit proposed a trans-basin diversion of water from the Guadalupe River watershed. In passing on the merits of the competing applications, the Commission was exercising its discretion within the limits of the various provisions found in Chapter 1, Title 128, particularly Article 7589 therein, which provides as follows:

"It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district to take or divert any of the water of the ordinary flow, underflow, or storm flow of any stream, water course, or watershed, in this State into any other natural stream, water course or watershed, to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted."

Article 7590 provides with regard to a proposed trans-basin diversion that "no such permit shall be issued by the Board [now the Commission] until after full hearing before said Board as to the rights to be affected thereby, * * *" Article 7591 provides penal sanctions for trans-basin diversion of water in violation of the two preceding articles.

The phrase, "to the prejudice of any person or property," in Article 7589 is descriptive of the nature of the interests which are protected by that Article, and a literal construction of this phrase would forbid diversion if it caused "prejudice" to *"any* person or property." Such a construction would have the intolerable consequence of defeating a project promising immense benefits to the receiving region or the State as a whole upon a mere showing of a slight harm to present or future interests. Moreover, the later expressions of the Legislature as found in the various provisions of the Wagstaff Act, discussed more fully later, charge the Water Rights Commission with the duty, when passing on applications, to give preference to "those applications the purpose for which contemplate and will effectuate the maximum utilization of waters and are designed and calculated to prevent the escape of waters without contribution to a beneficial public service." Articles 7506 and 7507 charge the Water Rights Commission with the duty to reject *all* applications "if the proposed use will impair existing water rights, or is detrimental to the public welfare" and to approve *all* applications "if the proposed appropriation contemplates the application of water to any of the uses and purposes

provided for in this chapter, and does not impair existing water rights, or vested riparian rights and is not detrimental to the public welfare." These statutory provisions apply to all applications for permits before the Commission and indicate no legislative intent to exclude applications which propose a diversion of water from the originating watershed. Instead, it is apparent that the Legislature intended to prohibit diversion out of the basin of origin only to the extent such diversion would impair water rights in existence at the time of the proposed diversion. Considering the nature of the interests to be protected and the further provision in Article 7590 that a permit for trans-basin diversion shall not be granted "until after full hearing before said Board as to the rights to be affected thereby," we have also concluded that as to any water in the originating basin found to be in excess of that amount required to protect existing rights, the Legislature intended that the Commission should, in a balancing process, take into consideration future benefits and detriments expected to result from a proposed trans-basin diversion and that there would be "prejudice" only if the benefits from the diversion were outweighed by detriments to the originating basin. See Johnson and Knippa, Trans-basin Diversion of Water, 43 Tex.L.R. 1035, 1044 (1965).

With this construction of Article 7589 in mind, we now turn our attention to the record made in the trial court to determine if San Antonio has sustained the burden of showing that the order denying their application is not reasonably supported by substantial evidence, existing at the time of the entry of the order by the Commission.

San Antonio's evidence consisted of the following documentary evidence: a certificate from the Secretary of State that San Antonio's home rule charter was properly filed; resolutions and ordinances relating to the filing of San Antonio's presentation and application for a permit before the Commission; San Antonio's presentation, request for extension, application for a permit and the orders of the Commission in relation thereto; the application for a permit filed by GBRA; the orders of the Commission granting in part the GBRA application and denying San Antonio's application; the permit issued to GBRA; a letter from Chairman Beckwith refusing to file San Antonio's original presentation; a certificate from the Secretary of the Commission that no contracts had been filed between GBRA and a municipality for use of water under GBRA's permit; and a prospectus printed by San Antonio relating to the sale of water revenue bonds. San Antonio presented one witness, the general manager of the Water Works Board of Trustees of San Antonio, but his brief testimony related solely to the sale of revenue bonds by the Water Works Board and the information contained in the above-mentioned prospectus. At this point San Antonio rested its case, whereupon the Attorney General moved for judgment on behalf of the Commission and rested. GBRA, however, did not join in the motion of the Attorney General for judgment but proceeded to introduce evidence.

### GBRA's Evidence

The Chairman of the Board of Directors of GBRA testified that GBRA was charged with the development of the water resources in a ten county area within the boundaries of GBRA; that GBRA was engaged in several related businesses such as operating a soil conservation program, financing and participating in the construction of Canyon Dam, and operating six hydroelectric plants; and that GBRA had executed a contract with the United States to purchase storage space in the Canyon Dam Reservoir for an initial consideration of $1,400,000 of which $1,370,000 had already been paid.

A consulting engineer for GBRA testified at length about the history of the Canyon Dam Project including various proposed locations for the dam site, storage capacities at the proposed locations, and the negotiations between GBRA and the Corps of Engineers that ultimately produced

the construction of the Canyon Dam Reservoir. The engineer testified that the Canyon Dam Project was included in the original master plan of the GBRA approved by the Board of Water Engineers (the Water Rights Commission) in 1942; that in 1956, prior to the hearing before the Commission, he made a study of the proposed Canyon Dam Reservoir to determine the "safe yield" of the reservoir. This witness defined "safe yield" as "the maximum amount of water that can be withdrawn continuously from that reservoir during the most critical drought period anticipated, without the supply failing or the reservoir going dry." The import of this testimony is that if withdrawals of water above the "safe yield" level are allowed, inflow to the reservoir over a representative period of time will be less than outflow resulting in periodic depletion of the reservoir supply. The frequency and severity of such periods would be dependent upon such factors as the weather (especially watershed rainfall), reservoir leakage and the degree to which the water withdrawn from the reservoir exceed the "safe yield" level. His conclusion was that if the Canyon Dam Reservoir had a storage capacity of 394,500 acre-feet, the safe yield from the reservoir would be 102,700 acre-feet per year. He stated that this yield was based on the given amount of storage in the reservoir without releasing water to satisfy downstream rights and that the yield would not be the same if 100,000 acre-feet of water per annum were removed from the watershed at the reservoir "because the water would not be available to the prior downstream rights." He also stated that in making this study he assumed there would be no leakage from the reservoir, but if leakage did occur the dependable yield of the reservoir would be reduced. The witness was of the opinion that the Canyon Dam Reservoir would not be a dependable source of water for the City of San Antonio.

GBRA introduced a report styled "The Kenedy Dam and Reservoir as a Surface Water Supply for the City of San Antonio,"

dated June, 1956, which had been prepared by a firm of consulting engineers. The report states that the construction of a dam and reservoir near Kenedy, Texas, on the San Antonio River and a combination of surface water supply and ground water supply from the Carrizo Sands would supply San Antonio with a feasible supplemental source of water "of satisfactory quality * * * under a well planned water re-use program."

The Vice President and General Manager for Ambursen Engineering Corporation testified that in 1956 he was employed by the Texas Power Corporation and the Texas Hydro-Electric Corporation to make two studies of the effect that the construction and operation of the Canyon Dam Project would have on the power production of six hydro-electric plants downstream from the dam site. One study was based on the operation of the reservoir if San Antonio's application to divert 100,000 acre-feet per annum was granted and the other study was based on the operation of the reservoir if GBRA's application was granted. The conclusion reached in these studies was that if San Antonio was allowed to divert 100,000 acre-feet per annum, each of the hydro-electric plants would lose the benefit of an average of 59,000 acre-feet per annum; if GBRA's application was granted, each of the six plants would gain an average of 34,000 acre-feet per annum of usable water. Converted into dollars and cents, the effect of the proposed diversion by San Antonio would mean a loss of $317,000 for Texas Power Company and $279,900 for Texas Hydro-Electric Corporation each year. On the other hand, if GBRA's application was granted, the increase in revenue for Texas Power Corporation would be $266,100 and for Texas Hydro-Electric Corporation $203,500.

The witness was also employed by duPont Corporation and Union Carbide Corporation to make a similar study. The conclusion reached in both reports was that diversion of 100,000 acre-feet of water from Canyon Dam Reservoir would be detri-

mental to the plant operation of both companies.

He further testified that if the water was retained within the Guadalupe watershed, approximately twenty principal uses would be made of the water by various cities, towns and industrial groups that depend on the Guadalupe River as a source of water supply.

A geologist testified that he was employed by GBRA to make a study of the water resources in the Carrizo Sands available to the City of San Antonio as a supplemental water supply. The conclusion reached was that a large supply of water could be made available to San Antonio by developing a well field just below the outcrop of the Carrizo Sands in Wilson County. He also testified with regard to a study he made of the Canyon Dam Project while he was working for the Crops of Engineers. The study showed that at the present site of the reservoir three major faults exist which run transversely to the reservoir and are a part of what is known as the Balcones Fault zone. Because of these underlying faults, it was his opinion that there definitely would be leakage from the reservoir, but the amount of such leakage could not be determined until the reservoir is filled and tested.

An engineer and geologist specializing in ground water studies, testified at length about the physical structure and characteristics of the Carrizo Sands near San Antonio and the Edwards Limestone formations. In his opinion both areas were available as future sources of water supply for the City of San Antonio. He also was of the opinion that there would be a leakage problem in the Canyon Dam Reservoir.

The General Manager of the San Antonio City Water Board was recalled as an adverse witness by GBRA and testified about a report styled "The Role of the Edwards Reservoir in The San Antonio Water Story." The report was prepared by the San Antonio City Water Board in August, 1963. The report was admissible under our

holding in Pickens v. Railroad Commission, 387 S.W.2d 35, 47 (Tex.1965). With regard to San Antonio's water supply, the report showed the following:

"No emergency exists now, and no emergency is likely to come about in the next 15 or 20 years. There is no water shortage now in the San Antonio area. The need is one of planning for the future, not obtaining water for the present.

" * * *

"San Antonio can, if necessary, obtain all of its water supply from Edwards wells for at least another 15 or 20 years. Computations of future water levels on this basis show that water levels at San Antonio during this period are not likely to be more than 20 feet below the 1956 level. The computations were extended to the year 2000 on the basis of all the water demand being met from Edwards wells. The most severe drought was included twice in the computations made for the period 1963–2000. These computed water levels are shown on the graph on page 20. It is evident from this graph that San Antonio faces no immediate water shortage."

The Manager of Utilities for the City of Seguin testified that the City of Seguin has only one source of water supply—the Guadalupe River. He stated that during the drought of the mid-fifties the Guadalupe River stopped flowing and the only water available to Seguin was a small pool impounded by the Texas Power Corporation. During this period the Seguin hydroelectric plant was shut down entirely for lack of water and the City was compelled to purchase electricity from other sources.

An engineer with Central Power & Light Company, testified that his company operated hydroelectric plants on the Guadalupe River at Gonzales and Cuero. Both plants are dependent upon the normal, natural flow of the Guadalupe River. In his opinion, if 100,000 acre-feet per annum were diverted out of the Guadalupe watershed,

and there was a recurrence of the drought conditions of the mid-fifties, no water would be available for cooling purposes at these plants.

There is other testimony in the record as to municipal need within the boundaries of GBRA. There is also testimony relating to industrial development and prospective urban needs which to some extent supports the premise that the Guadalupe River Basin is a developing and growing industrial area and that urban communities within the basin are increasing in size.

 San Antonio takes the position in this Court that the record made by GBRA shows that there was no evidence in existence at the time of the trial which would support the award to GBRA of 50,000 acre-feet of water for municipal purposes. We reiterate that the burden was upon San Antonio to establish that both orders of the Commission were not supported by substantial evidence. San Antonio has failed to satisfy this burden. In making this holding, we do not overlook San Antonio's contention that the issue is not 100,000 acre-feet but the 50,000 acre-feet which the Commission has found available as unappropriated water and assigned to GBRA. On the evidence before us, we must overrule this contention. There is evidence in the record that water retained within the watershed is susceptible to multiple use because all water uses are not consumptive uses. It is apparent that water unappropriated and available for use within the originating watershed is not necessarily the equivalent of water unappropriated within the originating watershed but to be used outside the watershed.

*Wagstaff Act*

 San Antonio has also brought forward points assigning error to the Court of Civil Appeals' holding that under the various provisions of the Wagstaff Act (Articles 7471–7472d) [3] the Commission is

---

3. "Art. 7471. Priority in appropriation of water. In the conservation and utilization of water declared the property of the State, the public welfare requires not only the recognition of uses beneficial to the public well being, but requires as a constructive public policy, a declaration of priorities in the allotment and appropriation thereof; and it is hereby declared to be the public policy of the State and essential to the public welfare and for the benefit of the people that in the allotment and appropriation of the waters defined in Article 7467, of the Revised Civil Statutes of Texas of 1925, preference and priority be given to the following uses in the order named, to wit:

"1. Domestic and Municipal uses, including water for sustaining human life and the life of domestic animals.

"2. Water to be used in processes designed to convert materials of a lower order of value into forms having greater usability and commercial value, and to include water necessary for the development of electric power by means other than hydro-electric.

"3. Irrigation.

"4. Mining and recovery of minerals.

"5. Hydro-electric power.

"6. Navigation.

"7. Recreation and pleasure."

"Art. 7472. Between appropriators.

"As between appropriators, the first in time is the first in right, provided, however, that all appropriations or allotments of water hereafter made for hydro-electric power, irrigation, manufacturing, mining, navigation, or any other purposes than domestic or municipal purposes, shall be granted subject to the right of any city, town or municipality of this State to make further appropriations of said water thereafter without the necessity of condemnation or paying therefor, for domestic and municipal purposes as herein defined in paragraph numbered '1' of Art. 7471 as herein amended any law to the contrary notwithstanding.

"Art. 7472a. Inapplicable to streams constituting boundary of Mexico.

"The provisions of Section 2 of this Act shall not apply to any stream which constitutes or defines the International border or boundary between the United States of America and the Republic of Mexico.

"Art. 7472b. Eminent domain for acquisition of waters for domestic, municipal and irrigation purposes.

"The right to take waters necessary for domestic and municipal supply pur-

vested with broad discretion to grant or deny San Antonio's application for a permit to appropriate water for municipal purposes. San Antonio contends that when the Commission accepted and filed their "presentation" under Article 7496, the acceptance was tantamount to a finding by the Commission that the presentation was for an approved purpose under Article 7507[4]; that Article 7507 directs the Commission to issue a permit when the subsequent application is for an approved purpose under

Articles 7470 and 7471, because Article 7472b provides that "[t]he right to take waters necessary for domestic and municipal supply purposes is primary and fundamental, and the right to recover from other uses, waters essential to such purposes shall be paramount and unquestioned in the policy of the State,"; and that the provisions of the Wagstaff Act which give a priority to municipal use modified or repealed Article 7589[5] insofar as cities and towns are concerned.

poses is primary and fundamental, and the right to recover from other uses, waters essential to such purposes shall be paramount and unquestioned in the policy of the State, and in the manner Constitutional and Statutory authority provide. All political sub-divisions of the State, and Constitutional Governmental Agencies exercising delegated Legislative powers, are recognized to have the Right of Eminent Domain, to be exercised as permitted by Law for uses domestic and municipal and manufacturing, for authorized purposes, including the irrigation of lands for all requirements of agricultural employment.

"Art. 7472c. Conservation of water resources for public welfare.

"In the administration of laws provided for the maximum judicious employment of the State waters in the public interest, it shall be the duty of the State Board of Water Engineers, or other administrative agency designated for the service by the State, to conserve this natural resource in the greatest practicable measure for the public welfare; and recognizing the Statutory precedent established for granting the privilege to take and utilize the waters of the State for uses recognized and authorized, it shall be the duty of the State Board of Water Engineers or other agency of the State designated for the purpose to observe the rule that as between applicants for rights to use the waters of the State, preference be given not only in the order of preferential uses declared, but that preference also be given those applications the purposes for which contemplate and will effectuate the maximum utilization of waters and are designated and calculated to prevent the escape of waters without contribution to a beneficial public service.

"Art. 7472d. Surveys to disclose measure and potential availability of water resources.

"It shall be the purpose and policy of the State and of the enactments in accord therewith, in effecting the greatest beneficial utilization of waters of the State, to cause to be made all surveys essential to disclose the measure and potential availability of the water resources of the State to uses recognized; and to ascertain from necessary investigation the character of the principal requirements of the distinct regional division of the watershed areas of the State for the uses herein authorized, to the end that distribution of the right to take and use the waters of the State may be the more equitably administered in the public interest, and privileges granted for the uses recognized may be economically coordinated, achieving the maximum of public value from this resource; and recognizing alike the distinct regional necessities for water control and conservation, and for control of harmful floods."

4. "Art. 7507. Board to approve applications.

"It shall be the duty of the Board to approve all applications and issue the permit asked for if such application is made in proper form in compliance with the provisions of this chapter and the regulations of said Board; and is accompanied by the fees required in this chapter; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this chapter, and does not impair existing water rights, or vested riparian rights and is not detrimental to the public welfare."

5. "Art. 7589. Unlawful to divert water. "It shall be unlawful for any person, association of persons, corporation, water improvement or irrigation district to take or divert any of the water or the ordinary flow, underflow, or storm flow of any stream, water course, or watershed, in this State into any other natural

We overrule these contentions. In Southern Canal Co. v. State Board of Water Engineers, supra, we stated that Article 7507, "has directed the Board [Water Rights Commission] to issue a permit if the proposed appropriation contemplates use of the water for approved purposes." There can be no doubt that San Antonio's application was for an "approved purpose"; however, in Southern Canal we gave equal recognition to the remaining requirements of Article 7507 which requires the issuance of a permit only if it "does not impair existing water rights or vested riparian rights, and is not detrimental to the public welfare." Furthermore, we have preceded this statement by saying: "To make certain that such waters are so conserved and used the Legislature has created the State Board of Water Engineers and has entrusted to it broad discretion, within certain statutory limits, in determining whether an application for a permit to appropriate and divert such waters to a particular use shall be granted or denied." The "statutory limits" within which the Commission's discretion must be exercised are set out in Article 7507 as "not impair existing rights or vested riparian rights, and * * * not detrimental to the public welfare." Of necessity, the determination of these issues involves the exercise of a sound and reasonable discretion on the part of the Water Rights Commission.

█ San Antonio contends that Article 7472b is an expression of State policy which operates to limit the Commission's discretion in passing on applications for permits and which modifies or repeals Article 7589 insofar as cities and towns are concerned. In our opinion, Article 7472b, supra, relates solely to the exercise of the power of eminent domain for acquisition of water for domestic, municipal and irrigation purposes and was not intended by the Legislature to be a directive to the Water

Rights Commission in passing on competing applications for permits. Any other construction would create a direct conflict between Article 7472b and Article 7472c which specifically admonishes the Water Rights Commission "that as between applicants for rights to use the waters of the State, preference be given *not only in the order of preferential uses declared* [by Article 7471], *but that preference also be given those applications the purposes for which contemplate and will effectuate the maximum utilization of waters* and are designated and calculated to prevent the escape of waters without contribution to a beneficial public service." San Antonio answers this by arguing that if Article 7472c gives the Commission discretion to ignore the priorities established in Article 7471, then Article 7472c is unconstitutional because such purpose is not contained in the caption of the Act. The question of violating the order of priority of uses is not presented in this case. San Antonio and GBRA were before the Commission competing for permits for *out-of-basin-municipal use and in-basin municipal use,* respectively. Certainly the preference given to municipal use by Article 7471, which San Antonio says gives them priority for out-of-basin use, is equally applicable to municipal use within the Guadalupe basin by GBRA. We hold that Wagstaff Act does not modify or repeal Article 7589.

We come now to consider the appeal insofar as it relates to the order granting GBRA a permit.

### Delegation of Authority

█ San Antonio contends that the Court of Civil Appeals erred in upholding the Commission's order granting Permit No. 1886 to GBRA because, in granting said permit, the Commission has illegally delegated its exclusive authority to administer water rights to the GBRA, and therefore, it is argued that the permit is invalid.

stream, water course or watershed, to the prejudice of any person or property situated within the watershed from which

such water is proposed to be taken or diverted."

GBRA contends that San Antonio is without justiciable interest and standing to complain of the order of the Commission granting GBRA's application to appropriate water for municipal purposes from the Canyon Dam Reservoir in Comal County to the extent of 50,000 acre-feet per annum. We cannot agree with GBRA's contention that San Antonio is not a "person affected" by the order granting GBRA's application, nor can we agree that San Antonio is not a "party aggrieved" within the meaning of Section 12 and Section 14 of Article 7477. Section 12 of Article 7477 provides for a right of review of the Commission's orders and reads in part as follows:

"Any person affected by any ruling, order, decision, or other act of the Board, may, within one hundred and twenty (120) days after the date on which such act is performed, or, in case of a ruling, order, or decision, within one hundred and twenty (120) days after the effective date thereof, file a petition in an action to review, set aside, modify, or suspend such ruling, order, decision, or other act. * * *"

Article 7477, Section 14, provides for a right of review of the trial court's judgment and reads as follows:

"Any party aggrieved by any judgment or order of a district court in any suit or judicial proceeding brought under the provisions of this Chapter shall have the right to a review on appeal to the Court of Civil Appeals, and by appeal or writ or error to the Supreme Court, as in other civil cases in which the district court has original jurisdiction, and subject to the Statutes and rules of practice and procedure in civil cases."

We hold that San Antonio qualifies, within the meaning of Section 12, as a "person affected" by the Commission's order granting GBRA's application and permit. Both applications were filed with the Commission as separate applications for permits, on separate dates, and by separate parties. However, both applications sought to appropriate water from the same source; furthermore, both applications sought to appropriate water for the same purpose—that of municipal use. The Commission consolidated both applications for public hearing because GBRA and San Antonio were opposing each other's application and to a large degree the same considerations were applicable to both applications and a determination of the issues presented could only be made after a balancing of the benefits and detriments expected to result from granting or denying either or both applications. Obviously, the Commission's order granting GBRA's application to the extent of 50,000 acre-feet was based on a determination by the Commission that the benefits in granting San Antonio's application did not outweigh the detrimental results of diverting water out of the Guadalupe River watershed. To this extent, certainly San Antonio is a "person affected" within the meaning of Section 12, and for the same reason is a "party aggrieved" by the judgment of the district court upholding the orders of the Commission within the meaning of Section 14.

■ The 50,000 acre-feet of water granted by Permit No. 1886 to GBRA was granted for the highest priority of use as declared by Article 7471; any attack on the granting of the permit must be on the basis of the manner in which the rights under the permit are to be administered and not on the use (municipal) to be made of the water. San Antonio argues that in granting GBRA a permit for the entire unappropriated water of the Guadalupe watershed for municipal purposes, the Commission has made the rights of subsequent municipal users of the water subject to a decision of GBRA as to whether GBRA will elect to contract to supply water to the various users or whether it will be more profitable for GBRA to use the water covered by the permit for inferior purposes such as turning the turbines of the hydroelectric plants owned by GBRA. This argument is based on the assumption that the only effective control the Water Rights

Commission has retained over the 50,000 acre-feet is a veto power exercised by approving or disapproving any subsequent contracts entered into between GBRA and municipal users. We cannot agree with this contention.

Article 16, Section 59(a) of the Texas Constitution, Vernon's Ann.St. provides that the waters of this State are "public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." The Constitutional authority · for the creation of GBRA is found in Article 16, Section 59(b) of the Texas Constitution:

> "There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and *with the authority to exercise such rights, privileges and functions* concerning the subject matter of this amendment *as may be conferred by law.*" [Emphasis added.]

Even though the authority for the creation of GBRA is found in the above constitutional provision, any authority exercised by GBRA has also been "conferred by law." The statute specifically creating the GBRA is Article 8280–106, and provides in part as follows:

> "Section 1. * * * Such District shall be and is hereby declared to be a governmental agency and body politic and corporate, with the rights, privileges, and functions *hereinafter specified,* and the creation of such District is hereby determined to be essential to the accomplishment of the purposes of Section 59 of Article 16 of the Constitution of the State of Texas, including *(to the extent hereinafter authorized)* the control, storing, preservation and distribution of the waters of the Guadalupe and Blanco

Rivers and their tributaries for irrigation, power, and other useful purposes, the reclamation and irrigation of arid, semi-arid and other lands needing irrigation, and the conservation and development of the forests, water and hydroelectric power of the State of Texas.

> "* * *

> "Sec. 2. Except as expressly limited by this Act, the District shall have and is hereby authorized to exercise all powers, rights, privileges, and functions conferred by General Law upon any District or Districts created pursuant to Section 59, of Article 16, of the Constitution of the State of Texas. Without limitation of the generality of the foregoing, the District shall have and is hereby authorized to exercise the following powers, rights, privileges, and functions:

> "(a) to control, store and preserve, within the boundaries of the District, the waters of the Guadalupe and Blanco Rivers and their tributaries for any useful purpose, and to use, distribute and sell the same, within the boundaries of the District, for any such purpose;

> "* * *

> "(p) *nothing herein* shall be construed as conferring any water rights on the District, or as fixing any priority of rights, but *said District shall obtain its water rights by application to and permit from the State Board of Water Engineers as provided by General Statute.*

> "Sec. 3. The powers and duties herein devolved upon the said District shall be subject to the continuing rights of supervision by the State, which shall be exercised through the State Board of Water Engineers, and in appropriate instances, by the State Reclamation Engineer, each of which agencies shall be charged with the authority and duty to approve, or to refuse to approve, the adequacy of any plan or plans for flood control or conservation improvement purposes devised by the District for the

achievement of the plans and purposes intended in the creation of the District, and which plans contemplate improvements supervised by the respective State authorities under the provisions of the General Law." [Emphasis added.]

As seen from the above quotation, the GBRA Act specifically provides that any water rights granted to GBRA must be obtained by applying to the Water Rights Commission "to obtain its water rights by application," and GBRA's water rights, just like other applicants, are determined by General Statute found in Chapter 1, Title 128 of our statutes. The statute clearly authorizes GBRA to apply to the Commission for a permit to appropriate water for municipal purposes and to *sell* such water if the permit is granted, to municipal corporations. The permit is couched in language within the framework of the statute. The permit[6] grants to GBRA au-

---

6. Permit No. 1886 provides as follows:
"NOW, THEREFORE THE
BOARD OF WATER ENGINEERS OF
THE STATE OF TEXAS DOES BY THESE
PRESENTS GRANT THIS PERMIT
unto the said Guadalupe-Blanco River Authority to appropriate, divert and use certain public waters of the State, to consist of the storm, flood and unappropriated public waters of the Guadalupe River in Comal County, Texas, not to exceed 50,000 acre feet of water per annum or so much thereof as may be necessary when beneficially used for the purpose of municipal use.

"Before acquiring any right to divert water hereunder, permittee shall acquire from the Corps of Engineers, United States Army, adequate conservation storage space in the proposed Canyon Reservoir. Said reservoir as represented in the plans filed with the application is to have a total capacity of 740,900 acre feet, of which 366,400 acre feet is conservation storage capacity. No diversions under the terms of this permit shall be made by the permittee until a copy of the contract between said permittee and the Corps of Engineers, United States Army, whereby the conservation storage space is acquired by said permittee, is filed with the Board of Water Engineers.

"The permittee is authorized to use the bed and banks of the Guadalupe River to convey the water from the proposed reservoir to the pumping plants of the municipalities with which said permittee has contracted to supply said municipal water. It is specifically provided that no releases of water under the terms of this permit shall be made to any municipality until a copy of the executed contract between said municipality and the permittee has been filed with and approved by the Board of Water Engineers, and this applies to assignees and agents of municipalities.

"The north end of the proposed Canyon Dam is to be located at a point which bears N. 40° 15'; E. 8,241 feet from the east corner of the William G. Smith Survey, Abstract No. 542, on the north bank of the Guadalupe River in Comal County, Texas and is distant in a northwesterly direction from New Braunfels, Texas, fifteen (15) miles.

"The permittee shall store in the above described conservation storage space only storm, flood and unappropriated public waters of said stream, subject to all the rights of prior appropriators and lawful diverters below. Whenever the Board finds that the permittee is storing any water to which downstream appropriators and lawful diverters are entitled, the permittee shall release same to said appropriators or lawful diverters on the order of the Board. By accepting this permit, permittee agrees to abide by and comply with any such order of the Board without delay. Failure to comply with any such order shall constitute grounds for forfeiture and cancellation.

"The permittee shall install a metering instrument which will automatically record to within 5% of accuracy the total amount of water diverted. Both the metering instrument and the installation thereof shall be subject to approval by the Board.

"Any surplus water shall be returned to the stream at the point designated as the tunnel outlet structure on the plans filed by the permittee with the application, to which reference is here made for all purposes.

"Any other relief sought or additional matter requested in said Application No. 1964 which is not specifically granted by this permit is hereby expressly denied.

"This permit is granted with the reservation and upon the condition that the permittee will fully comply with the orders, terms, conditions and provisions hereof; by the acceptance of this permit, the permittee agrees to be bound by the enumerated terms, conditions and provisions; and beneficial use of water

thority to appropriate, divert and use certain waters of the State as may be necessary when beneficially used for the purpose of municipal use. The permit expressly provides that the permittee, its successors and assigns, shall comply with the laws and the rules, regulations and orders of the Board of Water Engineers (Water Rights Commission). San Antonio argues that in granting this permit the Commission surrendered every shred of legislative power granted it, except that of the "veto power". It is argued that the permit granted herein covering all of the unappropriated water delegated to the GBRA the determination as to which cities in the Guadalupe River Valley were to be granted the right to use the unappropriated water with the power to deny to any city such right unless a contract were executed satisfactory to GBRA. We disagree. In making such contention, San Antonio assumes that GBRA's permit to appropriate 50,000 acre-feet of water is a "blanket permit". This, however, is not the case. The powers granted the GBRA under the permit are subject to the continuing rights of supervision by the State. This supervision is to be exercised through the Water Rights Commission. Geared to the Statute, particularly Sec. 3 thereof, the permit issued to the GBRA by the Commission requires that the contracts entered into with municipalities must be filed with and approved by the Commission. While GBRA has been given the right to sell water for municipal use, the GBRA Act, the statutes, the permit itself and the rules and regulations of the Commission, provide ample remedies and protection against any action by GBRA in failing to sell or in selling its water to municipalities. Keep in mind that we have held that San Antonio is a "person affected" by the order granting GBRA's application. GBRA's permit would be subject to cancellation should it fail, in whole or in part, to put to beneficial use the water authorized under its permit. See Article 7519a. This Article empowers the Water Rights Commission to initiate proceedings to cancel any permit which is not being used. GBRA cannot legally refuse to sell municipal water to any particular municipality. The GBRA is under a duty to serve the public without discrimination. See Allen v. Park Place Water, Light & Power Co., (Tex.Civ.App. 1925, err. ref.), 266 S.W. 219. The Texas Statutes, herein discussed, specifically entitle the Water Rights Commission to compel GBRA to furnish municipal water without discrimination. Article 7560 provides that any person entitled to use water from any reservoir can present a petition to the Commission showing that GBRA has a supply of water not contracted to others and available for his use. Upon such showing and upon the further showing that GBRA has failed and refused to supply such water to him, GBRA can be compelled to deliver such water in accordance with the Commission's order. Not only that, safeguards are statutorily provided in the event GBRA should seek to supply an unreasonable amount of water to any particular municipality, or should seek to fix an unreasonable price for municipal water. The Water Rights Commission is entitled under Article 7563 to fix reasonable rates to be charged by GBRA for furnishing the water for all purposes. Under the terms of the permit itself, the Water Rights Commission can refuse to approve the contract where it is found that it attempts to furnish too much water, or attempts to furnish it at an unreasonable price, or for any other reason. GBRA, in its briefs filed in this Court, acknowledges the correctness of our construction of the permit, and ac-

---

under the terms of this permit shall constitute acceptance of the permit. Failure on the part of the permittee to comply with such terms, conditions and provisions will subject this permit to forfeiture and cancellation, to which the permittee agrees by acceptance of the permit. It is also expressly provided that the permittee, its successors and assigns, and any beneficiary hereunder, shall comply with the law and the rules, regulations and orders of the Board of Water Engineers formulated by it pursuant to law."

knowledges the power of the Water Rights Commission to exercise continuing supervision over its permits, as we have held, and that continuing supervision which San Antonio desires it to exercise. In no sense can it be said that GBRA is the holder of a "blanket permit" with no authority to be exercised by the Commission. Article 7492 was amended in 1953. Neither the body [7] nor the emergency clause [8] of the Act purports to deal with the contents of any permit to be issued by the Commission. The emergency clause provides that *water laws* shall not be interpreted as "granting blanket permits or control over the waters of certain streams or parts of streams to State political subdivisions", but, significantly, it is provided that all political subdivisions shall be required to obtain a permit the same as any other person.

There is no showing that the permit granted to GBRA in any degree impairs existing water rights. There is nothing in the permit which can be said to be detrimental to the public welfare or to the City of San Antonio in particular. This Court said in Southern Canal Co. v. State Board of Water Engineers, supra, that "[b]y the enactment of Articles contained in Chapter 1 of Title 128 of our statutes the Legislature has sought, in a comprehensive way, to regulate the use of waters from our rivers, streams and lakes * * *." As heretofore mentioned, the Legislature has created the Water Rights Commission and has entrusted to it broad discretions within certain statutory limits, in determining whether an application for a permit to appropriate and divert such waters to a particular use shall be granted or denied. We went on to

state in Southern Canal v. Board of Water Engineers, supra, that the Legislature has specifically provided that it shall be the duty of the Board (the Commission) in determining applications to reject all applications and refuse to issue the permit asked for if there is no unappropriated water in the source of supply; or if the proposed use will impair existing water rights; or is detrimental to the public welfare. We find nothing in this record to even indicate that the Commission has illegally delegated to GBRA its exclusive authority to administer water rights.

The judgments of the trial court and the Court of Civil Appeals are affirmed.

7. "Every person, association of persons, public or private corporation, *political subdivision of the State, agency of the State or of the United States,* who shall, after this Act shall take effect, desire to acquire the right to appropriate, for the purposes stated in this Chapter, unappropriated water of the State, shall * * * make an application in writing to the Board for a permit to make such appropriation, storage or diversion."

8. "The fact that the present water laws of Texas should be clarified so that they may not be interpreted as granting blanket permits or control over the waters of certain streams or parts of streams to State political subdivisions and to make certain that final authority rests with the Board of Water Engineers to grant, in accordance with the present system of water use priorities, all permits for specific installations, creates an emergency * * *" etc.