## CITY OF EL PASO, The State of Texas, and Office of Public Utility Counsel, Petitioners,

v.

## PUBLIC UTILITY COMMISSION OF TEXAS and El Paso Electric Company, Respondents.

### No. D–3053.

Supreme Court of Texas.

Argued Sept. 13, 1993.

Decided June 22, 1994.

Rehearing Overruled Oct. 6, 1994.

Norman J. Gordon, El Paso, James G. Boyle, Austin, Nanette G. Williams, David C. Caylor, El Paso, Luis A. Wilmot, San Antonio, Stephen Fogel, William L. Magness, W. Scott McCollough, Dan Morales, Joe K. Crews and Richard A. Muscat, Austin, for petitioners.

James W. Checkley, Alan Holman, Austin, Thomas S. Leatherbury, Ferd C. Meyer, Jr., Kenneth C. Raney, Jr., Dallas, R. Eden Martin, Chicago, IL, Barry Bishop, John F. Williams, Austin, Harry M. Reasoner, Houston, Walter Demond, Austin, Alton J. Hall, Jr., Houston, Norma K. Scogin, Dan Morales, Joe N. Pratt, and Davison W. Grant, Austin, for respondents.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justices HIGHTOWER, HECHT, and CORNYN join.

This is an administrative appeal from an order of the Public Utility Commission (Commission) setting rates to be charged by El Paso Electric Company (EPEC).[1] The order was consistent with a non-unanimous stipulation between EPEC and several parties, including the Commission General Counsel. In its final order, the Commission authorized EPEC to capitalize and include in rate base deferrals associated with certain post-in-service carrying costs and operating costs related to its investment in the Palo Verde Nuclear Generating Station (Palo Verde). The questions presented by this appeal are first, whether the Commission acted within its discretion by basing its final order, in part, on the nonunanimous stipulation agreement, and second, whether the Commission has the authority under the Public Utility Regulatory Act (PURA)[2] to allow a public utility to include in a utility's rate base certain costs incurred during the "regulatory lag" period.[3] We answer both issues yes, and consequently affirm the judgment of the court of appeals in part and reverse in part.

In April 1987, EPEC filed an application for a rate increase with the Commission seeking to recover costs associated with its investment in the Palo Verde Project. EPEC sought rate treatment related to its investment in the two units which had started commercial operation, Palo Verde Units 1 and 2.[4] On October 22, 1987, during the course of the hearing on EPEC's application, certain industrial intervenors and the Commission General Counsel announced and filed a stipulation agreement intended to resolve the case.[5] The Examiners scheduled an additional phase of the hearing to consider the stipulation, and eventually recommended to the Commission that the stipulation be rejected. The Commissioners modified the proposed stipulation and, as modified, adopted its terms in its final order.

As part of its request for a rate increase, EPEC requested that its rate base be in-

1. Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates*, Docket No. 7460, 14 Tex.P.U.C.Bull. 932, 1202 (June 16, 1988) (Docket No. 7460).

2. Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp. 1994).

3. Generally, regulatory lag is the delay between the time when a utility's profits are above or. below standard and the time when an offsetting rate decrease or rate increase may be put into effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base. *See* James C. Bonbright et al., Principles of Public Utility Rates 96 (2d ed. 1988).

4. EPEC and four other utility companies agreed to partially fund and otherwise assist in building one or more nuclear steam electric generating units, with attendant common facilities. Construction is complete on the common facilities and two of the five units originally planned (Palo Verde Units 1 and 2). After construction began, EPEC modified its ownership interest in the units. Originally, EPEC owned an undivided interest in each of the units as a tenant in common with the other four project participants. Although EPEC retains its undivided interest in Unit 1, the company has sold its interest in Unit 2 and made arrangements to lease the unit back for the duration of EPEC's involvement in the project.

5. EPEC, the Commission staff, and four corporate intervenors which purchased significant amounts of electricity from EPEC all signed the stipulation.

creased by the amount of carrying costs and operating and maintenance costs it incurred during the "regulatory lag" period. The utility had deferred these types of costs for Units 1 and 2, aggregating each type of cost for each unit into a separate capital account. EPEC obtained the Commission's prior permission to defer Unit 1 costs.[6] The Commission reserved the right, however, to refuse subsequently to include the deferred costs in the rate base to the extent they were unreasonable, related to plant not used and useful, or were spent or incurred imprudently. Although EPEC did not obtain prior permission to defer its post-in-service costs for Unit 2, it nevertheless deferred them. After the hearing, the Commission granted EPEC's request to include the deferred costs for both units in the rate base.

The City of El Paso (City), the State of Texas (on behalf of various state agencies located in western Texas) (State), and the Office of Public Utility Counsel (OPUC) sought judicial review of the Commission's order, contending that the Commission erred by basing its order, in part, on the non-unanimous stipulation. The City, State, and OPUC also argued that the Commission lacked the authority to permit EPEC to defer post-in-service costs, and subsequently to include the deferrals in the utility's rate base.

The trial court upheld the Commission's order. The court of appeals affirmed the portion of the trial court's judgment which affirmed the Commission's order allowing the inclusion of capitalized post-in-service operating costs in the utility's rate base. 839 S.W.2d 895, 934 (1991). The court of appeals reversed the portion of the trial court's judgment which affirmed the Commission's order allowing the deferral of post-in-service carrying costs. *Id.*[7] All parties filed applications for writ of error to this court. For the reasons stated below, we reverse the judgment of the court of appeals to the extent that it disallows the deferral of post-in-ser-

vice carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

## I.

### The Non–Unanimous Stipulation

The City and OPUC make several arguments supporting their position that the Commission erred by basing its order, in part, on a non-unanimous stipulation. They ask this Court to reverse the judgment of the court of appeals, contending that its holding affirms an action of the Commission that is not supported by substantial evidence, not consistent with Texas law, arbitrary and capricious and characterized by an abuse of discretion. We do not accept the City's or OPUC's arguments.

### A.

### Reliance on the Non–Unanimous Stipulation

The City and OPUC contend that where no evidence existed to support its decision, the Commissioners erroneously relied on the stipulation itself as a substitute for the evidence. The City argues that by relying on the stipulation as opposed to the evidence, the Commissioners violated the statutory requirement that every finding be based exclusively on the evidence. TEX.GOV'T CODE ANN. § 2001.141 (Vernon Pamphlet 1994). The City analogizes the present case to a civil cause in which the court renders an agreed judgment without consent of all the parties. It contends that in adopting the stipulation as a resolution of the case, the Commission improperly imposed the terms of the settlement on the non-signing parties.

We reject the City's analogy. In *Mobil Oil Corp. v. Federal Power Commission,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), the Supreme Court upheld the Federal Power Commission's final order establishing a rate structure that was based, in part, on a non-unanimous stipulation. The Court em-

---

6. The Commission authorized deferred accounting treatment for Unit 1 in Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 6350, 13 TexP.U.C.Bull. 1091, 1239–41 (1986).

7. The court of appeals separated the costs into two categories: (1) operating and maintenance costs, and (2) carrying costs. Our holding makes no distinction between these costs.

phasized the importance of considering a non-unanimous proposal "on its merit:"

> If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area.

417 U.S. at 314, 94 S.Ct. at 2348–49 (quoting *Placid Oil Co. v. Federal Power Comm'n,* 483 F.2d 880, 893 (5th Cir.1973)) (emphasis in original).

In Docket No. 7460, the Commission's order provided, in part:

> 4. Even where some parties to a proceeding do not agree to a stipulated result, it is reasonable to adopt such a stipulation if:
>
> (a) The parties opposing the stipulation have notice that the stipulation may be considered by the Commission and an opportunity to be heard on their reasons for opposing the stipulation;
>
> *(b) The matters contained in the stipulation are supported by a preponderance of the credible evidence in the case;*
>
> (c) The stipulation is in accordance with applicable law;
>
> (d) The stipulation results in just and reasonable rates; and;
>
> (e) The results of the stipulation are in the public interest, including the interest of those customers represented by parties opposing the stipulation.

Docket No. 7460, *supra* note 1, at 1202–03 (emphasis added).[8] The Commission's order continued to conclude that:

> 5. Pursuant to the Findings of Fact and Conclusions of Law set forth below, the Commission finds the Amended and Restated Stipulation, as modified, is a reasonable basis for resolution of the issues in this case and that adoption of the Amended and Restated Stipulation, as modified, as the basis of the Commission's Order in this proceeding is in the public interest.

Finding of Fact No. 237 provided:

> 237. The provisions of the Amended and Restated Stipulation are reasonable and supported by a preponderance of the credible evidence in this record and should be adopted.[9]

■ It is clear from the Commission's order that, consistent with *Mobil Oil,* the Commission's decision in Docket No. 7460 was based on the merits; it was not simply an adoption of a non-unanimous "settlement." The Commission made an independent finding that the non-unanimous stipulation was supported by a preponderance of the record evidence and resulted in just and reasonable rates.[10] Thus, contrary to the City's arguments, the Commission's final order was consistent with the requirement that every finding be based exclusively on the evidence.

In addition to considering the non-unanimous stipulation on its merits, the Commission provided all parties, including non-signa-

---

8. We note that the Commission has used these same standards to evaluate non-unanimous settlements in several other dockets. *See, e.g.,* Tex. Public Utils. Comm'n, *Application of El Paso Electric Company to Declare Palo Verde Unit 1 in Service,* Docket No. 6764, 12 Tex.P.U.C.Bull. 1533, 1534–35 (November 14, 1986).

9. In addition to the recitations above, Conclusion of Law No. 28 stated: "The Amended and Restated Stipulation, as modified per Finding of Fact No. 6, represents a reasonable resolution of the contested issues in this docket, is supported in the record, is in the public interest, and should therefore be adopted, as the basis for the Commission's order in this case." Docket No. 7460, *supra* note 1, at 1280.

10. We note that the Commission's Final Order included 237 separate, specific Findings of Fact concerning the rate increase. The Commission specifically considered the amended and restated stipulation in the context of these findings as a whole. *See* Docket 7460, *supra* note 1, at 1233–74. Thus, contrary to the City's and OPUC's contentions, the Commission's findings supporting its reliance on the non-unanimous stipulation were not "wholly conclusory." Further, because the Commission explicitly provided that it was based on a review of the evidence in the record as a whole, we reject the City's contention that the Commission acted arbitrarily and abused its discretion as a fact finder and decision maker by adopting a contested settlement "without a review of the record or support in the evidentiary record."

tories, the opportunity to be heard on the merits of the stipulation. As the court of appeals notes, the Commission added an additional phase to the proceedings devoted exclusively to receiving evidence and argument on the propriety of using the stipulation as a basis for resolving the contested issues. 839 S.W.2d at 903. Thus, we reject the City's argument that the substantial rights of the City and other non-signatory parties were in some way prejudiced by the Commission's adoption of the non-unanimous stipulation.

The OPUC independently argues that the Commission's reliance on the non-unanimous stipulation agreement was arbitrary and capricious because the Commission failed to follow its own standards in relying on the stipulation. Specifically, the OPUC notes that the court of appeals concluded that the inclusion of deferred post-in-service carrying costs violates PURA section 41(a); and, because the stipulation included provisions concerning treatment of deferred carrying charges, the stipulation violates the Commission's own standard, *see supra* text above, that the stipulation be "in accordance with applicable law." As a result, the OPUC argues that the court of appeals should have reversed and remanded the Commission's final order *in toto*. Because we conclude that the inclusion of deferred post-in-service carrying costs does not violate PURA section 41(a), *see infra* IV., the OPUC's argument on this point is moot.

■ An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *Gerst v. Nixon*, 411 S.W.2d 350, 360 n. 8 (Tex.1966). We agree with the court of appeals that the City and OPUC have failed to establish that the use of the stipulation as a partial basis for the final order involves consideration of factors other than those the legislature has directed the Commission to consider. 839 S.W.2d 895, 903–04.

## B.

### Section 21.151

■ Section 21.151 of the Public Utility Commission's Rules of Practice and Procedure provides:

> After the expiration of the time for filing exceptions and replies thereto, the examiner's report and proposal for decision will be considered by the commission and either adopted, modified and adopted, or remanded to the examiner....

16 TEX.ADMIN.CODE § 21.151 (West 1990). The City and the OPUC argue that the Commission violated section 21.151 by basing its final order on a modified stipulation over the examiner's recommendation. This argument is without merit. First, section 21.151 does not speak to the Commission's ability to consider non-unanimous stipulations in reaching its orders. Second, the Commission is free to accept or reject the examiner's recommendations. *See Ross v. Texas Catastrophe Prop. Ins.*, 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ). Section 21.151 does not require the Commission to accept or reject the examiner's report in its entirety. Rather, the Commission may repudiate part of the examiner's report and modify it by deletion as it did in this case.

## C.

### Findings of Facts/Substantial Evidence

In a final challenge to the Commission's use of the non-stipulation agreement, the City argues that "[t]he non-unanimous 'stipulation' used by the Commission ... is not supported by substantial evidence and key findings of fact drafted to support the final order are inadequate to satisfy statutory requirements." We will discuss the City's specific substantial-evidence and finding-of-fact challenges. *See infra* II–III. However, to the extent the City makes a general complaint against the stipulation, we agree with the court of appeals that the City has waived any argument on this point as its point and argument are too general to preserve error. The City provides no substantive argument to support its legally conclusory statements.

## II.

### Substantial Evidence—"Decisional" Imprudence Disallowance [11]

The Commission concluded that due to imprudent decisions, $32 million of EPEC's costs should not be included in rate base. Both the City and OPUC argue that the disallowance is unsupported by substantial record evidence, claiming that the amount disallowed should have been greater.

At its core, the substantial evidence rule is a reasonableness test or a rational basis test. *Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.,* 817 S.W.2d 36, 41 (Tex.1991). The reviewing court, then, concerns itself with the reasonableness of the administrative order, not the correctness of the order. *Id.* In applying this test, we may not substitute our judgment as to the weight of the evidence for that of the agency. *Id.* (the substantial evidence rule "prevents the court from 'usurping the agency's adjudicative authority even though the court would have struck a different balance' ").

Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Id.* at 453; *Imperial American Resources Fund, Inc. v. Railroad Comm'n,* 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n,* 407 S.W.2d 752, 758 (Tex.1966).

The City argues that although the City, EPEC, and the Commission staff each offered expert testimony on the decisional imprudence issue, the evidentiary record contains no specific reference to amount. Further, the City contends that the court of appeals erred by relying, in part, on matters included in the non-unanimous stipulation to conclude that the Commission's decision was supported by substantial evidence because the matters relied on were not independently supported by a preponderance of the evidence.

In the Findings of Fact, the Commission provided:

101. The Company was not entirely prudent in its planning and management of its participation in the Palo Verde project.

102. There is evidence in the record of imprudence in the Company's continuing evaluation of the level of its participation in the Palo Verde Project. The parties to the Amended and Restated Stipulation have quantified The [sic] cost of such imprudence as $22 million as applied to Units 1 and 2. The Company has conceded an additional $10 million disallowance to be applied to PVNGS Units 1 and 2.

103. Quantification of the effects of imprudence requires the exercise of judgment based upon the evidence. In light of the evidence relating to prudence and the difficulties in quantification, the quantification of decisional imprudence at $32 million for Units 1 and 2 is reasonable and appropriate.

Docket No. 7460, *supra* note 1, at 1250.

The record before this Court is extensive and contains substantial information relevant to the Commission's inquiry on this issue. The evidence includes expert testimony offered by the City, EPEC, and the Commission staff. The City's witness, Ben Johnson, stated that in his opinion the EPEC had made several imprudent decisions and that, as a result, the Commission should disallow 50% of its costs.[12] EPEC testified that there

---

11. "Decisional" imprudence refers to EPEC's decisions to become involved in the Palo Verde Project, the extent of its involvement and its decisions to remain in the project at the 15.8% participation level.

12. Although not clear from Mr. Johnson's testimony, under his suggested approach, the imprudence disallowance would have exceeded $350 million.

should be a zero disallowance because there simply was no decisional imprudence. The Commission staff offered testimony that certain aspects of the Company's decision making process were imprudent. However, the Commission's witnesses did not conclude that the decision to participate in the project was itself imprudent. Rather, they focused on the perceived errors associated with EPEC's decision making process. The Commission's witnesses noted that they were unaware of any theory that would enable them to recommend any specific disallowance of project costs or capacity based on their conclusions.[13]

The evidence before the Commission therefore ranged from expert testimony that no imprudence disallowance should be imposed, to testimony that a 50% imprudence disallowance should be imposed, and finally to testimony that there is no known theory to quantify the flaws in EPEC's decision making process giving rise to its investment. In other words, several experts had significant differences of opinion on the proper method to determine and the proper amount of EPEC's imprudence disallowance. These differences are understandable when considering the enormous complexity involved in a utility's decision to construct or purchase new generating capacity.

In conducting a substantial-evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex.1988), *cert. denied*, 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). We agree with the court of appeals that the record contains substantial evidence to support a disallowance figure of zero for decisional imprudence; and, the record contains substantial evidence to support a Commission finding that 50 percent of EPEC's costs should have been disallowed. *See* 839 S.W.2d at 907. Thus, because of the admitted complexity in valuing the decisional imprudence in this case, we hold that there is a reasonable basis for the Commission to, in its discretion, select an amount within the range of figures provided by expert testimony of the parties.[14] Moreover, the City and OPUC have failed to explain why any one amount within that range is more reasonable or better supported by the evidence than the $32 million figure eventually reached by the Commission. The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *Imperial American Resources Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n*, 407 S.W.2d 752, 758 (Tex. 1966). We do not accept that the City and OPUC have met their burdens to overcome the presumption in this case.

13. We note that the Examiner likewise recognized flaws in EPEC's decision making process. However, the Examiner noted that "it is too much to ask that one reconstruct the appropriate process fifteen years after the fact in order [to] find whether a decision made on an inappropriate basis might still have been made on an appropriate one." Docket No. 7460, *supra* note 1, at 981.

14. In affirming the Commission's order, the court of appeals relied in part on its determination that EPEC's agreement in the non-binding stipulation to a $32 million disallowance constituted a "quasi-admission." 839 S.W.2d at 907. The court of appeals concluded that "[b]ecause it is a statement contrary to EPEC's pecuniary interest, the concession has some evidentiary weight." *Id.* While we need not address whether the EPEC's agreement in the non-binding stipulation constituted a "quasi-admission," we note that it is debatable as to whether EPEC's acceptance of a $32 million figure was in fact a statement against its pecuniary interest, considering that the evidence could have supported a much higher disallowance. *See supra* note 12.

## III.

### Final Revenue Requirement [15]

The City complains generally about the revenue requirement determination and then makes specific contentions concerning particular components of the revenue requirement. The City argues that the final revenue requirement of the Commission was based solely on the non-binding stipulation agreement and not on the record evidence. According to the city, the findings and conclusions adopted by the Commission do not allow this Court to analyze the decision because the agreement between the parties is not evidence and not a statutory standard for review. We disagree.

Finding of Fact No. 152 provides:

The preponderance of the evidence establishes that the company has a total revenue requirement with components as set forth in Exhibit B of the Amended and Restated Stipulation.

Docket No. 7460, *supra* note 1, at 1260. This finding is supported by twenty-five underlying findings of fact addressing the components of the total revenue requirement, with each finding supported by record evidence. *Id.* at 1260–1265 (Findings of Fact 153–87). Except for the specific challenges to three of the components making up the total revenue requirement, the City does not complain specifically that any particular underlying finding supporting Finding of Fact No. 152 is not supported by substantial evidence. We presume that the Commission's decision is supported by substantial evidence. *Charter Medical*, 665 S.W.2d at 453.

■ In addition, we reject the City's argument that the Commission applied no statutory standard in determining revenue requirements. As the City recognizes, the statutory standard that controls revenue requirement determinations is that rates be fixed to permit the utility a reasonable opportunity to earn a reasonable return on its invested capital plus "reasonable and neces-

sary" operating expense to provide service. TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a). The Commission's determination of the revenue requirement is supported by findings which detail the Commission's resolution of contested issues regarding the Company's "reasonable and necessary" operating expenses. Thus, the statutory standard for determining the revenue requirement was met.

The City makes numerous challenges to three components of the final revenue requirement, including (1) Operating and Maintenance expenses; (2) Employee Benefits; and (3) Taxes other than Federal Income Taxes. After reviewing the opinion of the court of appeals, the briefs of the parties, and the record, we conclude that the City's arguments on these issues are without merit. The court of appeals correctly articulates the error in the City's claims. 839 S.W.2d at 927–31.

## IV.

### Deferrals

The City, OPUC, and State make several arguments contesting the Commission's authority to permit the deferral of post-in-service costs, and the inclusion of the deferred costs in the utility's rate base.[16] In *State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994), we held that the Commission possesses the authority to allow a utility to defer post-in-service costs in order to protect the utility's financial integrity. We further held that the subsequent inclusion of the deferred costs in the utility's rate base did not violate PURA section 41(a), nor did it violate the rule against retroactive ratemaking. As a result we reject the arguments of the City, OPUC and State on these issues. We will address only those issues that were not addressed in *State of Texas v. Public Utility Commission*.[17]

15. The final revenue requirement represents the total revenues needed by the utility in order to cover its reasonable and necessary operating expenses and receive a return on the rate base.

16. The Commission allowed EPEC to include $74,503,575 of deferrals in rate base. Docket

No. 7460, *supra* note 1, at 1258 (Finding of Fact 144).

17. In *State of Texas v. Public Utility Commission*, 883 S.W.2d 190, we held that the Commission must consider to what extent the inclusion of the deferred cost assets in rate base is actually necessary to preserve the utilities' financial integrity.

188

## A.

### Test Year Requirement

■ PURA requires utilities to file for a rate increase by presenting revenue and expense data from the same 12-month period using an historical test year. TEX.REV.CIV. STAT.ANN. art. 1446c, § 3(t); 16 TEX.AD-MIN.CODE § 23.21(a); *Suburban Utility Corp. v. Public Utility Comm'n,* 652 S.W.2d 358, 366 (Tex.1983). In *State of Texas v. Public Utility Commission,* we held that an accounting order authorizing deferred accounting treatment does not violate the test year requirement because there is no requirement in PURA or the Commission's procedures that the Commission must follow a test year when determining accounting policy. However, in the context of a rate case, the test year requirement applies. Thus, we must address the argument that the actual inclusion of deferred costs in a utility's rate base violates the test year requirement.

The State argues that post-in-service costs were deferred for up to 25 months and thus, the inclusion of such rates in EPEC's rate base violated the test year requirement.[18] However, the Commission may, in its discretion, go outside the test year when necessary to achieve just and reasonable rates. In *Suburban Utility Corp. v. Public Utility Commission,* 652 S.W.2d 358, 366 (Tex.1983), we stated that "[c]hanges occurring after the test period, if known, may be taken into consideration by the regulatory agency to help mitigate the effects of inflation and in order to make the test year data as representative as possible of the cost situation that is

apt to prevail in the future." Because it ordered the deferral of post-in-service costs, the Commission understood the impact of deferring post-in-service costs on the test year. It is within the discretion of the Commission to consider expenditures that occur outside the test year if such consideration will assist the Commission in making the test year as representative as possible to the cost situation expected in the future.

## B.

### Standards Applied

The Commission granted EPEC's request to defer post-in-service costs for Unit 1 based upon a "financial integrity and viability" standard. Docket No. 6350, *supra* note 6, at 1239–41. However, the Commission granted EPEC's unit 2 request for deferred accounting based on a "measurable harm" standard. Docket No. 7460, *supra* note 1, at 1079. The City argues that the use of two different standards is arbitrary and capricious because the Commission has created new standards for each decision concerning deferred accounting.[19] We disagree.

■ In determining whether to allow a particular utility to defer post-in-service costs, the Commission has discretion to proceed on an *ad hoc* or "case-by-case" basis. *See, e.g., Securities and Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *National Labor Relations Bd. v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926 (Tex.App.—

883 S.W.2d at 201. We noted that such a determination should be made at the rate hearing. *Id.* Because no party argued that the Commission should have made such a determination in this case, any argument on this point is waived.

18. The deferral period for Palo Verde Unit 1 was twenty-five months and for Unit 2 was nineteen months.

19. We note that in *State of Texas v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held *that the Commission possesses the authority to authorize deferred accounting treatment of post-in-service costs. Further, we concluded that it was not an abuse of discretion for the Commission to apply a financial integrity standard to*

determine whether to authorize deferred accounting because that standard "ensured that the utilities will receive an opportunity to recover the minimum rates mandated by PURA." *Id.* at 197. However, in *Office of Public Utility Counsel v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held that the measurable harm standard lacked "a foundation in the regulatory scheme provided by PURA" and, as a result, the Commission abused its discretion by applying the measurable harm standard to determine whether to allow deferred accounting. 883 S.W.2d at 196. We note that the City does not contest the Commission's decision as to Unit 2 on the grounds that it was based on a standard that was too speculative. Thus, we do not address that issue in this case.

Austin 1988, writ denied). In *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947), the Court stated that *ad hoc* adjudication may be preferable to a formal rulemaking proceeding where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule;" and where the problem is so "specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." Both of the foregoing considerations apply in the Commission's early attempts to define the proper standard to apply to deferred accounting cases.[20]

Early in the process, the Commission was faced with numerous complex problems presented by the recent arrival of nuclear generation plants. While remaining within the statutory framework of PURA, the Commission had to balance the interests of consumers with the complex financial consideration created by public utilities investing large amounts of capital in nuclear plants. Proceeding on an *ad hoc* or "case-by-case" basis is fully understandable in the context of a newly created competitive market that involves complex technical considerations and competing statutory objectives. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied); *see also Securities and Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947). As a result, we hold that the Commission was within its discretion in proceeding on a "case-by-case" or *ad hoc* basis and applying different standards in different proceedings.[21]

## V.

### Conclusion

We hold that the Commission did not err by basing its final order, in part, on a non-unanimous stipulation. Further, based on our holding in *State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994), we hold that the Commission has the authority under PURA to include deferred post-in-service costs in a utility's rate base. Further, the Commission did not abuse its discretion by applying different standards in determining whether to allow deferred accounting treatment for Palo Verde Units 1 and 2. We reverse the court of appeals to the extent that it disallows the deferral and inclusion in rate base of deferred post-in-service carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

Justice SPECTOR, joined by Justice GONZALEZ, Justice DOGGETT, and Justice GAMMAGE, dissenting.

This case demonstrates the weakness of the safeguards relied upon today in *State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994). In that case, the majority defends its approval of deferred accounting treatment on the ground that deferred cost assets will be included in rate base only to the extent that they are deemed "prudent, reasonable and necessary." *Id.* at 197–198 n. 12. In the present case, however, the majority approves the Public Utility Commission's application of a similar standard, despite a total lack of evidence supporting the Commission's findings. I dissent.

At the rate hearings below, the City of El Paso presented extensive evidence concerning the imprudence of El Paso Electric Company's decisions to become involved in the Palo Verde Project and to remain involved at the 15.8 percent participation level. *See* Tex. Pub. Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change*

---

**20.** In fact, the Commission ultimately concluded that the measurable harm standard was too speculative. *See, e.g.*, Tex.Public Utils. Comm'n, *Petition of Houston Lighting and Power Company for Approval of Deferred Accounting Treatment for Limestone Unit 2 and the South Texas Project Unit 1*, Docket No. 8230, 14 Tex.P.U.C.Bull. 2752, 2811 (April 19, 1989).

**21.** The Commission's discretion to proceed on a "case-by-case" basis is not absolute. When the underlying considerations that support *ad hoc* adjudication are no longer present, then the Commission will be bound to follow the formal rulemaking procedures set out in the Tex.Gov't Code Ann. § 2001.141. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied).

*Rates,* Docket No. 7460, 14 Tex.P.U.C.Bull. 932, 965–84 (June 16, 1988). The City's expert testimony concluded that 50 percent of the cost of all three Palo Verde units should be disallowed as imprudent. *Id.* at 983. Using this figure, some $350 million should have been disallowed for Unit 1 alone.

The Commission agreed that El Paso Electric was "not entirely prudent" in planning and managing its participation in the Palo Verde project. *Id.* at 1250. In determining the amount of the disallowance, however, the Commission chose not to rely on the evidence presented; instead, it seized upon a figure of $32 million that had been discussed in the course of settlement negotiations. *Id.* at 1250–51. El Paso Electric's own expert testified, in regard to the settlement amount, "I don't think it really relates to anything." The $32 million figure has no basis in reality; it resulted solely from the parties' efforts to buy peace.

The majority cites no evidence in support of the $32 million disallowance, because none exists. Nonetheless, the majority upholds the Commission's findings as supported by substantial evidence. *Supra* at 186.

With the standard of review applied today, it is difficult to imagine any Commission decision relating to prudence that would be set aside by the Court. This lack of review will be especially pernicious in the context of deferred cost assets. Valuing the prudence of such assets will involve the same degree of complexity as valuing the imprudence in this case. Thus, in approving deferred amounts for inclusion in rate base, the Commission may arbitrarily select a figure within a wide range, and its decision will effectively be immune from judicial review. Judging by the example of this case, the figure selected will typically be much closer to the utility's recommended figure than it is to the ratepayers'.

I would hold that the disallowance for decisional imprudence must be based on the evidentiary record. Additionally, for the reasons stated in my dissenting opinion in *State of Texas v. Public Utility Commission,* 883 S.W.2d at 205–209, I would hold that no expenses incurred after the beginning of commercial operation may be capitalized and included in rate base. Accordingly, I would remand this cause to the Commission for a determination of rates in keeping with traditional standards.