# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00642-CV

**Mark Griffin Meyer, Appellant**

**v.**

**Texas Department of Insurance, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. D-1-GN-10-000006, HONORABLE GISELA D. TRIANA-DOYAL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Mark Griffin Meyer appeals from a district court judgment affirming a final order of the Texas Insurance Commissioner revoking Meyer's insurance license. In two issues, Meyer asserts that the notice of the contested-case hearing that preceded the revocation order was defective and that the order is not supported by substantial evidence. We will affirm the district court's judgment.

## BACKGROUND

Prior to the revocation order, Meyer had held a Texas general life, accident, and health insurance license for approximately two decades. Although Meyer had once focused his business on selling health and life policies to small business owners, over time he had come to trade primarily in insurance products serving the investment needs of clients who were at or near retirement age.

In 1997, Meyer was introduced to a businessman named Michael Kelly, who claimed to own several hotels in and near Cancun, Mexico and numerous other Mexican and Panamanian properties and businesses. Kelly was in the process of recruiting agents in the U.S. to sell a non-insurance investment product known as a "nine-month note" offered through a Kelly entity, the Yucatan Investment Corporation, ostensibly to finance various Kelly business endeavors. As the product's name suggests, the nine-month note was an unsecured promissory note that paid investors 10.75% in interest over a period of nine months. Before agreeing to do business with Kelly, according to Meyer, a business associate ran a background check on Kelly that revealed no cause for concern. Meyer further claimed that he visited Kelly in Mexico, stayed in a hotel that Kelly purported to own, and became assured of Kelly's business acumen, good character, and great wealth. Meyer began marketing the nine-month note to his insurance clients. For his services in selling the nine-month note to his clients, Meyer was paid commissions of between twelve and fourteen percent.

Sales of the nine-month note by Kelly's U.S. sales agents attracted the attention of regulatory authorities in at least four states other than Texas, who initiated investigations as to whether the nine-month note was a security that had not been registered as required by law. In response to these regulatory actions, Kelly agreed to remove the product from the market. In its stead, a succession of Kelly entities (these included "Resort Holdings International," "Yucatan Resorts," and companies with variations on such names) began offering an investment product known as a "universal lease." Simply described, the universal lease was (at least facially) similar to a timeshare, entitling an investor to the right to use or sublet a Cancun-area hotel room—in properties that Kelly or his companies purported to own—for specified periods each year. Alongside the universal lease was marketed a "servicing agreement," whereby a Kelly-controlled management

2

company (e.g., "Majesty Travel," "Viaje Majesty," and "World Phantasy Tours") would "rent, manage, administer, and collect on behalf of the Leaseholder all rental income of their lease." In exchange for executing the servicing agreement, investors were given the option of collecting a share of the actual rental income from their lease, collecting six percent of the lease's purchase price annually as rental income, or collecting the six percent rental income plus an additional five percent annually (for a total of eleven percent of the lease purchase price) if they granted the management company an option to purchase the lease. Payments to investors were to be made monthly.

Meyer testified that he began selling the universal lease to his clients in 1999, after attending a Kelly-run training program in Mexico and being assured, by securities counsel employed by Kelly, that the new product fully complied with applicable legal requirements. Meyer sold the universal lease product exclusively from 1999 until 2003, when he exhausted his personal client base. Meyer succeeded in persuading most of his clients who had purchased the nine-month note to roll their interests into the universal lease. For his efforts, Meyer earned commissions on his initial universal lease sales of between twelve and eighteen percent, an additional twelve-percent "renewal" commission for each client who remained invested in the product for more than two years, and further commissions on sales by "down line" sales agents whom Meyer recruited to sell the product. In total, Meyer was ultimately found to have received approximately $1.1 million in commissions from universal lease sales over approximately seven years. Furthermore, Meyer would later testify that he invested approximately $125,000 in earned sales commission into universal lease purchases for himself.

Although Meyer's clients apparently received timely monthly payments on their universal lease investments as late as 2004, the payments would eventually slow and

3

ultimately cease altogether. These events, and unsuccessful attempts by investors to liquidate their investments—including elderly individuals who had invested retirement savings in the product—prompted federal and state investigations into possible wrongdoing by Kelly, Meyer, and over two hundred other sales agents who had marketed the universal lease throughout the U.S. For Meyer, the legal fallout included the Texas Department of Insurance's (TDI's) initiation of the underlying proceeding in 2007 to revoke Meyer's insurance license.

TDI staff gave notice of its intent to seek revocation based on Meyer's alleged violation of section 4005.101, subsection (b)(5), of the Insurance Code. That provision makes a licensee's engagement in "fraudulent . . . acts or practices" a ground for disciplinary action by the Commissioner. Tex. Ins. Code Ann. § 4005.101(b)(5) (West 2009). If the Commissioner determines that this ground exists, she "may . . . discipline a license holder," *id.*, including revoking or suspending an agent's license. *See id.* § 4005.102 (West 2009) ("In addition to any other remedy available under Chapter 82, for a violation of this code, another insurance law of this state, or a rule of the commissioner, the department may . . . suspend, revoke, or deny renewal of . . . a license").

Because it frames the context of the parties' assertions on appeal, it is helpful at this juncture to note the legal standard that the Commissioner applied in determining whether Meyer had engaged in "fraudulent . . . acts or practices." The Commissioner concluded, and the parties do not dispute, that "fraudulent . . . acts or practices" could be established with proof of each element of common-law fraud. Those elements are:

(1)     a "material" representation was made;

(2)     the representation was false;

4

(3)     scienter as to the falsity of the representation at the time it was made, which may be satisfied with proof either that the speaker (a) had knowledge of the falsity, or (b) acted recklessly without knowledge of the truth and as a positive assertion;

(4)     the speaker made the representation with the intent that the other party should act upon it;

(5)     the party acted in reliance on the representation; and

(6)     the party thereby suffered injury.

*See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).

To meet its burden, TDI staff relied on proof that Meyer had made essentially two sets of representations to his clients that had proved to be false. First, as Meyer himself acknowledged in testimony, he assured his clients that if they invested in the universal lease product, signed the servicing agreement, agreed to grant the management company an option to purchase the lease, and kept the funds invested for at least two years, they would have the right to withdraw their funds without penalty at any time. To establish the contemporaneous falsity of these statements, staff introduced copies of the universal lease and the servicing agreement. On the face of each document, neither conferred on investors a right to withdraw their funds as Meyer had stated. To the contrary, the universal lease stated that repurchase of the lease was in the discretion of the Kelly entity, not the investor.

Second, TDI staff emphasized evidence that Meyer had given his clients assurances that they were "virtually guaranteed" to garner returns of ten or eleven percent if they invested in the universal lease and signed the servicing agreement. To establish the contemporaneous falsity of these statements, staff relied heavily on evidence—chiefly, the testimony of Angela Cole, the

5

assistant director of the Texas Securities Board's enforcement division—to the effect that Kelly and his entities were operating a Ponzi scheme, funding their monthly payments to universal lease investors (not to mention the generous commissions to sales agents as well as Kelly's personal expenses on such luxuries as yachts and homes) principally with incoming money from new investors rather than from hotel room rentals and other business revenues.

Two of Meyer's clients who had invested in the universal lease, Catherine Niggli and Terry Goolsby, also testified during the hearing. In addition to confirming that Meyer had made the foregoing representations to them, they professed that they had relied upon the statements when making their investments, that the statements were integral to their investment decisions, and that they had subsequently incurred injury when the monthly payments ceased and they were unable to liquidate their investments as Meyer had promised.

While acknowledging having made these representations, Meyer denied any knowledge of their falsity or of any wrongdoing by Kelly. Meyer claimed, for example, that he had believed that the eventual slowdown in monthly payments had been attributable to a succession of hurricanes that had devastated the Cancun area and its tourism economy in 2004 and 2005, causing a precipitous drop in rental income from the hotels. Meyer further emphasized that he had invested over $120,000 of his own earnings in the universal lease product. As for inconsistencies between his representations regarding investors' rights to cash out and the actual contractual language, Meyer insisted that he was repeating or relying upon representations made to him by Kelly and his affiliates, as well as what Meyer claimed was his past personal experience that his clients had always been able to withdraw their funds invested with Kelly upon demand.

6

Following the hearing, the Administrative Law Judge (ALJ) issued a proposal for decision recommending that Meyer's insurance license be revoked on the grounds that he had "engaged in fraudulent acts or practices, in violation of Tex. Ins. Code Ann. § 4005.101(b)(5)." Underlying this ultimate finding or conclusion, the ALJ found that, as TDI staff had urged, Meyer had "marketed and sold the universal lease . . . and represented to [his clients] that they would receive a 'virtually guaranteed' 11 percent rate of return on their investment and would have the right to cash out of the lease after a two-year period, despite explicit language in the contract to the contrary"; that these representations "were false";[1] that he had made these representations "to encourage [his clients] to make purchases"; that the representations "were important to his customers in making their respective decisions to invest" (i.e., material); and that Niggli and Goolsby had "been injured by not being able to recover any of their investment money." With regard to scienter, however, the ALJ failed to find that Meyer had made his false representations knowingly. Instead, the ALJ found that Meyer had acted recklessly with respect to the truth of his assertions, inasmuch as "[a]t the time he made those representations, [Meyer] did not have sufficient information or bases to support his assertions." In addition to findings to the effect that Meyer had acted recklessly in overlooking or ignoring the actual contractual language governing investors' rights to cash out, the ALJ made numerous findings of underlying fact to the effect that Meyer should have been more

_____

[1] With respect to the right of investors to cash out their investments, the ALJ also found that "[t]he terms of the contract [Meyer] used in conjunction with his sales of universal leases did not require that investors' leases be repurchased" and that "[s]ome of the documents associated with the universal lease indicate that [it] was not a liquid investment and that there was no guarantee of repurchase." Regarding the safety and security of the investment, the ALJ found that "[t]he universal lease held attributes of a typical Ponzi scheme. The main source of revenue for all of Mr. Kelly's companies associated with the universal lease were new investor funds. These new investor funds were used to make the monthly lease payments to the existing investors."

7

diligent in ascertaining the true nature and risks of the universal lease product before marketing it to his clients.[2]

---

[2] These findings included:

10.  Before he began selling the nine-month note, [Meyer] went to Cancun, Mexico, where he met Mr. Kelly and stayed in a hotel that Mr. Kelly claimed to own.

11.  Mr. Kelly told [Meyer] that he owned multiple businesses, including a boutique car company, several successful oil and gas businesses, and a number of hotels and other businesses in both Mexico and Panama.

12.  [Meyer] never saw deeds or any other official documents to demonstrate that Mr. Kelly actually owned any of the businesses he claimed to own.

13.  [Meyer] does not currently know whether Mr. Kelly actually owned any of the businesses he claimed to own.

. . .

23.  [Meyer] was trained in Mexico by Mr. Kelly and his legal staff regarding how to sell the universal lease.

24.  Pursuant to the training he received, [Meyer] told his customers that they could get their investment money back at any time after the initial two years without penalty by simply writing to the company.

. . .

27.  The terms of the contract [Meyer] used in conjunction with his sales of universal leases did not require that investors' leases be repurchased.

28.  [Meyer] was aware that the average rate of return for annuities and other investments paying a fixed rate of return at the time was between one and five percent.

29.  [Meyer] told his clients, without first verifying the truth of his assertions, that if they purchased the universal lease, they would acquire first lienholder status in the affiliated properties and that those properties had been fully insured so that investors would still be paid in the event of a calamity.

The Insurance Commissioner adopted the ALJ's proposed findings and conclusions without substantive change and issued an order revoking Meyer's insurance license. After unsuccessfully moving for rehearing before the Commissioner, *see* Tex. Gov't Code Ann.

. . .

31.     [Meyer] never investigated the financial situation of any of the companies associated with the universal lease or the management company that was responsible for making payments to investors. [Meyer] was unaware of what, if any, assets or liabilities those companies had or what their total obligations were for payments on the universal lease terms.

. . .

41.     [Meyer] did not have any prior experience selling products similar to the universal lease or nine-month note.

42.     [Meyer] relies solely on information and/or documents that he received from Michael Kelly and/or from interested third parties who were not objective or independent, regarding the financial soundness of the universal lease.

. . .

44.     [Meyer] failed to conduct an adequate background check on Michael Kelly.

45.     [Meyer] failed to conduct an independent review of the financial information concerning the properties controlled by Michael Kelly.

46.     [Meyer] had no knowledge of lien enforcement in Mexico and had never sold investments involving property located outside of the United States.

47.     [Meyer] failed to adequately review the universal lease contracts and related documents provided to him by Michael Kelly.

48.     [Meyer] failed to obtain independent and objective information to verify the truth of the assertions he made to customers regarding the universal lease.

9

§ 2001.146(c) (West 2008), Meyer sought judicial review of the revocation order in the district court. *See* Tex. Ins. Code Ann. § 36.202 (West 2009); Tex. Gov't Code Ann. § 2001.171 (West 2008). The district court rendered judgment affirming the Commissioner's order. This appeal ensued.

## STANDARD OF REVIEW

Review of the Commissioner's order is governed by section 2001.174 of the Administrative Procedures Act (APA), which provides:

> a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1)     may affirm the agency decision in whole or in part; and
>
> (2)     shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
>   (A)     in violation of a constitutional or statutory provision;
>   (B)     in excess of the agency's statutory authority;
>   (C)     made through unlawful procedure;
>   (D)     affected by other error of law;
>   (E)      not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>   (F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174 (West 2008); *see* Tex. Ins. Code Ann. § 36.203 (West 2009). In two issues on appeal, Meyer asserts that we must reverse the district court's judgment affirming the Commissioner's order because (1) TDI's hearing notice was defective, and (2) the order is not reasonably supported by "substantial evidence."

"Substantial evidence," in the sense that it is used in subpart (2)(E), is essentially a rational-basis test whereby courts determine, as a matter of law, whether an agency's order finds reasonable factual support in the record. *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 813 (Tex. App.—Austin 2011, pet. filed) (op. on reh'g) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984)). We consider whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Id.* (citing *Collins v. Texas Natural Res. Comm'n*, 94 S.W.3d 876, 881 (Tex. App.—Austin 2002, no pet.)). The issue is not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action. *Id.* (citing *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994)). Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *City of El Paso*, 883 S.W.2d at 185. We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to prove otherwise. *City of Waco*, 346 S.W.3d at 813; *Collins*, 94 S.W.3d at 881.

## ANALYSIS

Each of Meyer's issues is focused primarily on TDI's theory that Meyer acted recklessly with respect to the truth of his representations concerning likely returns from universal leases by failing to "adequately" or "sufficiently" investigate the nature and soundness of the product before marketing it to his clients. In essence, Meyer urges in his second issue that the findings and underlying evidence do not support any cognizable legal duty on his part to investigate Kelly or the

product beyond the measures he undertook, that he breached such a duty (he emphasizes, for example, his testimony that a background check on Kelly revealed no problems, that he made several in-person visits to Kelly in Mexico, and that he obtained indicia and assurances of Kelly's business acumen, good character, and wealth), or that any such breach constitutes the sort of recklessness with respect to the underlying facts that could support fraud liability. The gravamen of Meyer's first issue is that TDI staff failed to give sufficient notice that it would be attempting to prove fraud predicated on this asserted lack of due diligence and unfairly surprised him with that theory at the hearing.

As a threshold matter, we observe that the Commissioner's revocation order is also supported by findings relating to a narrower theory of recklessness-based fraud predicated on the inconsistencies between Meyer's representations regarding his client's rights to cash out their universal lease investments and the actual text of the contracts that governs those rights. The Commissioner found (1) that he represented to his clients, including Niggli and Goolsby, that they could cash out any investments they made in the universal lease product upon request, and without penalty, after two years; (2) that this representation was false, inasmuch as the universal lease contained explicit language to the contrary; (3) that Meyer acted recklessly with respect to whether his representation was true or false; (4) that Meyer made the representations to induce his clients, including Niggli and Goolsby, to invest in the universal lease product, (5) that the representations were material; (6) that these clients relied upon the representations in making their investment decision; and (7) that the clients were ultimately injured thereby. These findings support the Commissioner's ultimate finding or conclusion that Meyer had engaged in "fraudulent . . . acts or practices," i.e., committed the elements of common-law fraud. *See Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 337 (elements of common-law fraud); *see also Charter Med.-Dallas, Inc.*,

12

665 S.W.2d at 453 (substantial-evidence analysis first inquires whether underlying findings of fact support the ultimate facts establishing agency's authority to take the action in question, then whether the underlying findings are supported by substantial evidence).

Meyer's substantial-evidence challenge focuses solely on the Commissioner's underlying findings of falsity and recklessness. At least with respect to the findings concerning Meyer's representations regarding his clients' rights to cash out their universal lease investments, those challenges are without merit.[3] The text of the universal lease explicitly gives the Kelly entity discretion whether or not to repurchase an investor's universal lease purchase. Substantial evidence likewise supports the Commissioner's finding that Meyer acted recklessly with respect to the truth or falsity of these representations. Texas fraud cases have applied the recklessness standard in accordance with the plain and ordinary meaning of that term: "characterized by creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash." *Black's Law Dictionary* 1385 (9th ed. 2009); *see Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977) (reversing summary judgment granted in favor of defendant because fact issue existed as to whether defendant committed fraud where the defendant "recklessly made a statement as a positive assertion without knowledge of its truth" by making representations based on hearsay when documents in his possession contradicted that hearsay); *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App.—Waco 2007, no pet.) (holding that evidence was factually and legally sufficient to support fraud finding where investment advisors told clients that their investments were guaranteed based on verbal representation from

---

[3] We express no opinion regarding the Commissioner's alternate theory related to Meyer's diligence in investigating the universal lease product.

13

third party when evidence suggested that there was no guarantee and that any return was contingent on other requirements); *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied) (stating that bank's failure to understand the identity of the borrower of its loan resulted in their making reckless misrepresentations to plaintiffs regarding plaintiffs' liability).[4]

Meyer urges that his representation that investors could recover their money without penalty after two years was not made recklessly because it was based on alleged representations made to Meyer by Kelly. At most, he asserts, his actions amount to negligent misrepresentation. *See Grant Thornton L.L.P. v. Prospect High Income Fund*, 314 S.W.3d 913, 919 (Tex. 2010) (listing elements of negligent misrepresentation, which include a failure "to exercise reasonable care or competence in obtaining or communicating the information"). But the fact that Meyer had in his possession and was aware of terms in the universal lease that contradicted his representation demonstrates that, rather than merely failing to exercise care in discovering information, Meyer had reason to know that his statements were false. *See* Restatement (Second) of Torts § 12 (1965)

---

[4] This interpretation of "reckless" representation is consistent with the Restatement's explanation of the requisite scienter for fraud. *See* Restatement (Second) of Torts § 526 cmt. e (1977) ("In order that a misrepresentation may be fraudulent it is not necessary that the maker know the matter is not as represented. Indeed, it is not necessary that he should even believe this to be so. It is enough that being conscious that he has neither knowledge nor belief in the existence of the matter he chooses to assert it as a fact. Indeed, since knowledge implies a firm conviction, a misrepresentation of a fact so made as to assert that the maker knows it, is fraudulent if he is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless of whether it is true or false."); *id.* cmt. f ("A representation of fact may be expressly stated to be based upon the maker's personal knowledge of the fact in question or even upon his personal investigation of the matter. So, too, though not expressly so stated, the representation may be made in a form or under such circumstances as to imply that this is the case. A misrepresentation so made is fraudulent even though the maker is honestly convinced of its truth from hearsay or other sources that he believes to be reliable.").

(explaining that having "reason to know" something "implies no duty of knowledge on the actor," but means that the actor has knowledge of facts from which a reasonable person would either infer the existence of the fact in question or at least act as though the fact existed); *see also Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 72 (Tex. 1997) (Hecht, J., dissenting) (citing the Restatement (Second) of Torts and explaining that "reason to know" is a recklessness standard under which the actor has knowledge of facts that would disclose danger to a reasonable person, which is not equivalent to "should know," which denotes a negligence standard under which the actor has merely failed to take precautions). Meyer's making of representations contrary to the terms of the universal lease constitutes recklessness sufficient to support the Commissioner's finding of fraud. *Cf. Stone*, 554 S.W.2d at 185. We overrule Meyer's second issue.

For similar reasons, we overrule Meyer's first issue, complaining of asserted deficiencies in the hearing notice. The contents of TDI's hearing notice are governed by section 2001.052 of the APA. 1 Tex. Admin. Code § 155.27 (2008) (Tex. Dep't of Ins., Notice of Hearing) ("referring agency shall provide notice of hearing to all parties in accordance with APA § 2001.052"), *repealed, amended, and recodified* 33 Tex. Reg. 9451 (2008) (proposed July 4, 2008) (current version at 1Tex. Admin. Code § 155.401 (Tex. Dep't of Ins., Notice of Hearing)); *see* Tex. Gov't Code Ann. §2001.052(a) (West 2008). Section 2001.052 requires, in relevant part, that "[n]otice of a hearing in a contested case must include . . . a short, plain statement of the matters asserted." *See* Tex. Gov't Code Ann. § 2001.052(a). Section 2001.052 further provides that "[o]n timely written application, a more definite and detailed statement shall be furnished not less than three days before the date set for the hearing." *Id.* § 2001.052(b) (West 2008).

TDI insists that Meyer waived any complaint with the hearing notice by failing to file a written application for a more definite and detailed statement or to object to going forward with the hearing. Meyer responds that he preserved this complaint, in substance, by filing a "motion to dismiss" the hearing notice on grounds that it failed to state a cognizable fraud claim and by moving to compel discovery regarding the factual bases of TDI's action.

Assuming that Meyer has preserved this issue for review, we conclude that the notice of hearing satisfied the requirements of section 2001.052, at least with respect to TDI's fraud theory predicated on Meyer's representations that investors could withdraw their funds without penalty after two years. Meyer contends that the notice was inadequate because it did not explain "what fraudulent or dishonest acts he committed." Contrary to Meyer's assertion, however, the notice provided a "short, plain statement" of the matters that TDI asserts amounted to fraud: the notice alleged that Meyer recruited his existing insurance clients to invest in the universal lease, telling them that "when investors wanted out of the program, the leasing agent would buy back the timeshare for the amount of the investment," and the notice further explained that this statement proved to be untrue and resulted in harm to Meyer's clients because, by "mid-2005, payments to thousands of investors had essentially ceased and many of them lost most or all of their retirement savings." These allegations, which provided Meyer with notice of the controlling facts of the case, were sufficient to satisfy the government code's requirements. *See Texas State Bd. of Pharm. v. Seely*, 764 S.W.2d 806, 814 (Tex. App.—Austin 1988, writ denied) (stating that meaningful notice requires prior notice of facts and law that will control the result to be reached by the agency); *cf. Garza v. Texas Alcoholic Beverage Comm'n*, 138 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("Sections 2001.051 and 2001.052 do not require the notice to describe

16

in detail—by name, place or date—every instance, conduct, or criminal offense giving rise to the TABC's denial of Garza's renewal application.  Only a short and plain statement of the matters asserted is required.").  We overrule Meyer's first issue.

## CONCLUSION

Having overruled both of Meyer's issues on appeal, we affirm the district court's judgment affirming the Commissioner's revocation order.

 

 

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   November 23, 2011