# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00005-CV

**City of Waco, Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GV-08-000405, HONORABLE DARLENE BYRNE, JUDGE PRESIDING**

---

## O P I N I O N

O-Kee Dairy applied to the Texas Commission on Environmental Quality (the Commission) for a major amendment to its concentrated animal feed operation (CAFO) permit to allow it to expand its dairy head capacity, increase its retention control structure capacity, and increase the number of acres used for land application of waste and wastewater. The City of Waco (the City) sought a contested case hearing to oppose the application. After conducting a public meeting to consider the City's request for a hearing, the Commission denied the request. The City sought judicial review of the Commission's order in a Travis County district court. *See* Tex. Water Code Ann. §§ 5.351, .354 (West 2008). The district court affirmed the order. Because we find substantial evidence in the record to support the Commission's decision to deny the City's hearing request, we affirm the district court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

O-Kee Dairy is one of a number of dairies located in the North Bosque River watershed. The Bosque River, a tributary of the Brazos River, is located northwest of the City of Waco. The North Bosque River is divided into two segments for purposes of administering water quality standards—Segment 1255 and Segment 1226. The O-Kee Dairy is located in the watershed of Segment 1226, which extends from a point downstream of the City of Stephenville, through Erath, Hamilton, and Bosque counties, and into McLennan County to the point where the North Bosque River flows into Lake Waco at its point of confluence with the Brazos River. Lake Waco provides the sole source of drinking water for approximately 160,000 people in and around the City of Waco. The lake is also used extensively for recreational activities. The City owns all adjudicated and permitted rights to the water impounded in Lake Waco and is authorized to divert water from the lake for municipal use, including providing public drinking water.

Segment 1255 and Segment 1226 have been designated by the Commission as "impaired under narrative water quality standards related to nutrients and aquatic plant growth." The impairment is due to high levels of nutrients, including phosphorus, in the water. Once it designated these segments as "impaired," the Commission was required to develop a "total maximum daily load" (TMDL) for those portions of the river. A TMDL is a plan for assimilation of the pollutants that are present in the water. *See* 33 U.S.C. § 1313(d)(1)(c) (2001). The Commission describes a TMDL as:

> a quantitative plan that determines the amount of a particular pollutant that a water body can receive and still meet its applicable water quality standards. In other words, TMDLs are the best possible estimates of the assimilative capacity of the

2

water body for a pollutant under consideration. A TMDL is commonly expressed as a load, with units of mass per time period, but may be expressed in other ways also. TMDLs must also estimate how much the pollutant load needs to be reduced from current levels in order to achieve water quality standards.

Phosphorus is one of the primary pollutants contributing to the impaired status of Segment 1255 and Segment 1226. Large amounts of phosphorus in the water cause excessive growth of algae and other aquatic plants, which in turn can cause taste and odor problems in drinking water and, under certain circumstances, contribute to the depletion of dissolved oxygen in the water. One major controllable source of phosphorus in the water is animal waste from dairy farms that, over the years, have become increasingly concentrated in the watershed. Most dairies collect wastewater and manure from the facilities in ponds called "retention control structures" (RCSs). The wastewater and manure are then applied to nearby fields as fertilizer. Phosphorus is primarily introduced into the watershed when the RCS's capacity to contain the waste is overcome by heavy rainfall. Heavy rains also cause runoff of manure and wastewater from application fields. Dairies in the Bosque River watershed must obtain CAFO permits from the Commission because the agricultural waste from their operations, including phosphorus which becomes dissolved in runoff or is otherwise discharged, ultimately discharges into the river. In 2002, the Commission amended the rules governing CAFOs, which include medium (200 to 699 cows) and large (700 cows or more) dairies, to require them to obtain individual permits when their then-current authorizations expired. *See* 27 Tex. Reg. 1511-33 (March 1, 2002) (amending 30 Tex. Admin. Code §§ 321.32-.49). The amended rules also imposed stricter requirements on the manner in which CAFOs in the watershed dispose of wastewater and manure by applying it to fields.

3

In 2004, the Commission again rewrote its rules, imposing even more stringent controls on CAFOs, especially those in the North Bosque River watershed. *See* 29 Tex. Reg. 6652-6723 (July 9, 2004) (amending Tex. Admin. Code §§ 321.31-.49). The rules were adopted to conform to changes in federal rules, to further implement impairment-zone legislation, and to further improve air and water quality in the state. CAFOs were allowed to continue operating under their existing authorization so long as the operator applied for an individual permit by July 17, 2004.

O-Kee Dairy originally obtained its CAFO permit from the Commission in 1999, prior to both the 2002 and 2004 revisions to the rules governing CAFOs. The dairy's operators applied for a major amendment to the permit in March 2004. The dairy requested the Commission to issue a permit authorizing it to expand its existing dairy facility from 690 cows to a maximum of 999 cows. The dairy also requested to increase the amount of land used for the application of wastewater and manure from 261 acres to 285.4 acres. The proposed permit required the dairy to come into compliance with the new rules by increasing its RCS capacity from 8.7 acre feet to 21.9 acre feet, and conducting land application of wastewater and manure in accordance with a nutrient management plan based on the crop's phosphorus, rather than nitrogen, requirements.[1] The dairy was permitted to continue to operate under the terms of its old permit while the Commission considered the application.

---

[1] In general, a crop's phosphorus application rate is lower than its nitrogen application rate. Switching from the nitrogen application rate to the lower phosphorus application rate reduces the amount of wastewater and manure applied to fields, thereby decreasing the potential for land-applied nutrients to enter surface water.

Following a technical review of the permit application, the executive director issued a preliminary decision that the permit, if issued, met all statutory and regulatory requirements. The preliminary decision triggered a period of public notice and comment. The City submitted its public comments to the Commission and requested a public meeting. After the public meeting, the executive director issued its response to the City's public comments. After the close of the notice and comment period, "affected persons" were entitled to submit a request for a contested case hearing. *See* Tex. Water Code Ann. § 5.115 (West 2008).[2] The City requested a contested case hearing. The Commission considered the request at a public meeting. The Commission denied the City's request after determining that the City was not an "affected person" within the meaning of the water code. *See id.* §§ 5.115 (defining "affected person"), .556 (prohibiting hearing unless requested by affected person as defined in section 5.115) (West 2008).

The City sought judicial review of the Commission's decision in a Travis County district court. *See id.* §§ 5.351, .354. The district court affirmed the Commission's order. This

---

[2] The term "affected person" is defined as follows:

For the purpose of an administrative hearing held by or for the commission involving a contested case, "affected person," or "person affected," or "person who may be affected" means a person who has a personal justiciable interest related to the legal right, duty, privilege, power, or economic interest affected by the administrative hearing. An interest common to members of the general public does not qualify as a personal justiciable interest. The commission shall adopt rules specifying factors which must be considered in determining whether a person is an affected person in any contested case arising under the air, waste, or water programs within the commission's jurisdiction and whether an affected association is entitled to standing in contested case hearings.

*See* Tex. Water Code Ann. § 5.115(a) (West 2008).

5

appeal followed. By one issue, the City claims that the Commission erred by denying the City's request for a hearing after concluding that it was not an "affected person."

## STANDARD OF REVIEW

We review orders of the Commission under the substantial evidence standard of review. *See City of San Antonio v. Texas Water Comm'n*, 407 S.W.2d 752, 756 (Tex. 1966); *Collins v. Texas Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 881-83 (Tex. App.—Austin 2002, no pet.) (substantial evidence review of commission order denying request for contested case hearing). Under this standard of review, the issue to be decided is the reasonableness of the Commission's order. *Id.* This is a question of law that requires the reviewing court to determine whether the Commission order finds reasonable support in the record. *See Texas Health Facilities Comm'n v. Charter Med.—Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984); *City of San Antonio*, 407 S.W.2d at 758. We consider whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Collins*, 94 S.W.3d at 881 (citing *Stratton v. Austin Indep. Sch. Dist.*, 8 S.W.3d 26, 30 (Tex. App.—Austin 1999, no pet.)). The issue is not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994). We may not substitute our judgment for that of the agency and may only consider the record on which the agency based its decision. *Stratton*, 8 S.W.3d at 30. The findings, inferences, conclusions, and decisions of the administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Collins*, 94 S.W.3d at 881 (reviewing decision to deny request for contested case hearing).

6

## DISCUSSION

The water code provides that the Commission "shall adopt rules specifying factors which must be considered in determining whether a person is an affected person" in a contested case arising under its jurisdiction. *See* Tex. Water Code Ann. § 5.115(a). Title 30, Chapter 55, Subchapter F,[3] of the Texas Administrative Code implements this provision by setting forth substantive criteria for the determination of who qualifies as an "affected person." *See* 30 Tex. Admin. Code § 55.203. The factors include, but are not limited to, the following:

(1) whether the interest claimed is one protected by the law under which the application will be considered;

(2) distance restrictions or other limitations imposed by law on the affected interest;

(3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

(4) likely impact of the regulated activity on the health and safety of the person, and on the use of the property of the person;

(5) likely impact of the regulated activity on use of the impacted natural resource by the person; and

(6) for governmental entities, their statutory authority over or interest in the issues relevant to the application.

*Id.* After considering the request, responses filed by the executive director, the Office of Public Interest Counsel, and O-Kee Dairy, and a reply filed by the City, the Commission denied the

---

[3] Subchapter F applies to applications, like the one at issue in this case, that are filed under Texas Water Code chapter 26 and declared administratively complete on or after September 1, 1999. *See* 30 Tex. Admin. Code § 55.200 (2010) (Comm'n on Environmental Quality, Applicability).

hearing request. The City appealed this decision to the district court, contending that, because it "will be potentially harmed by the agency action," it meets the established definition and criteria of an "affected person" and the Commission erred by finding otherwise. In its order denying the City's hearing request, the Commission stated that it evaluated the request for a hearing "under the requirements in the applicable statutes and Commission rules, including 30 Texas Administrative Code (TAC) Chapter 55." We will affirm the determination if there is substantial evidence in the record to support the Commission's conclusion that the City is not an "affected person."

The City's arguments center primarily on the fifth in the list of factors the Commission may consider—the likely impact of the regulated activity on use of the impacted natural resource by the person. In its request for a contested case hearing, the City argued that it was an "affected person" because it would be "significantly and adversely affected by the pollutants discharged by this dairy that flow downstream to Lake Waco." The City claimed that "wastewater discharges and runoff of pollutants from the O-Kee Dairy's waste application fields . . . that will be authorized by the [proposed permit] will contribute to the taste, odor, and public health problems" existing in the lake. The basis for its claim to "affected person" status was that Lake Waco would be "adversely affected by . . . [an] authorized increase in herd size from 690 to 999 cows, in that the amounts of phosphorus and pathogens transported from O-Kee Dairy and its waste application fields (including third party fields down the North Bosque River to Lake Waco) will increase." In essence, the City argued that granting the permit to allow an increase in the number of cows at the dairy would increase the amount of phosphorus discharged into the Bosque River in a manner that would negatively impact the City's use of the water for recreational activities and public drinking water

8

once it enters Lake Waco. The City also contended that increasing the amount of manure and wastewater that enters the river increases the cost to the City of treating the water to reduce taste and odor problems caused by pollutants from the North Bosque River. The Commission disagreed with the City's claim that issuing the permit would have an adverse affect on Lake Waco or the City.

The Commission had before it competent evidence that modifications to the dairy's management of its wastewater and manure required by the proposed permit would actually reduce, rather than increase, the likelihood that pollutants from the dairy would be discharged into the watershed. There was also competent evidence that the more stringent waste application requirements imposed by the proposed permit would reduce the amount of phosphorus runoff from waste application fields. Indeed, these new regulations were promulgated by the Commission to comply with Environmental Protection Agency rules and guidelines governing CAFOs. *See* 68 Fed. Reg. 7176-7274 (Feb. 12, 2003). The new requirements were categorized by their intended goals: reduce the potential for discharges, minimize the nutrient loading to land and surface water, and increase Commission oversight of the dairy's operational activities.

The proposed permit requires the dairy to bring its operations into compliance with the new rules regulating CAFOs. This includes increasing its wastewater and manure retention control structure capacity by approximately 13 acre feet. The increased storage capacity is designed to reduce the number of discharges from the dairy during heavy rainfall events, and reflects that, under the new rules, CAFOs may only discharge during a 25 year/10 day rainfall event as opposed to a 25 year/24 hour rainfall event. The existing retention structures were designed to capture and retain runoff from a 7.3 inch rainfall; the new structures must capture and retain runoff from a

9

12.2 inch rainfall. The dairy is also required to implement a retained control structure management plan to assure that it maintains wastewater volumes within the designed operating capacity of the structures, except during chronic or catastrophic rainfall events, and maintain sludge at or below the design sludge volume. These management tools reduce the likelihood of discharge during smaller rainfall events and reduce overflows associated with insufficient wastewater storage capacity.

The proposed permit also requires changes in the land application of manure and wastewater from the dairy. In order to minimize nutrient loading and the potential for nutrients to enter the watershed, the land application rate of manure and wastewater must be based on the crop's phosphorus requirements rather than its nitrogen requirements. For a coastal bermuda crop, all other things being equal, the result is a 40% decrease in the application rate. Manure, sludge, or wastewater in excess of that permitted to be applied to the land must be delivered to a composting facility, delivered to a permitted landfill, beneficially used by land application outside the watershed, or provided to operators of third-party fields for beneficial use in a manner consistent with Commission rules. The regulations on manure disposal contained in the proposed permit limit the unregulated disposal of manure and wastewater in the watershed.

The executive director's response to the City's public comments summarizes its position:

> Although the proposed permit authorizes an expansion from 690 head to 999 head, the conditions being proposed in this permit are anticipated to significantly reduce the potential for pollutants entering receiving waters. . . . These permit requirements, best management practices, and increased management and [Commission] oversight will protect water quality, when properly administered.

10

The Commission considered the management tools discussed above, and others required by the permit and described in the record, and found that although there will be more cows at the dairy, the overall impact of requiring the dairy to comply with current Commission rules will be to reduce the likelihood that phosphorus from the dairy will enter the watershed. The Commission concluded that the overall result of granting the proposed permit would be to decrease, rather than increase, the amount of phosphorus discharged into the watershed. It therefore rejected the City's argument that the City would be adversely affected by its granting the permit. This conclusion is supported by substantial evidence in the record. *See Collins*, 94 S.W.3d at 883 n.7 (denying "affected person" status when evidence before Commission demonstrated environment would be positively impacted by requested permit and compliance with permit would likely reduce odor emissions); *United Copper Indus. v. Grissom*, 17 S.W.3d 797, 799 (Tex. App—Austin 2000, pet. dism'd) (granting "affected person" status when proposed permittee's data indicated that its permitted operations would cause increased levels of lead and copper in air).

The record before the Commission also included evidence regarding the 82-mile distance from the dairy's location on the river to Lake Waco. The executive director's response to the hearing request concluded that any discharge from the dairy would, by the time it reached Lake Waco, be so diluted and assimilated into the water that it would not pose any danger to the health and safety of the City or its residents. The executive director also concluded that the recreational and drinking-water interests related to Lake Waco's water quality are common to the general public and are not a justiciable interest personal to the City. Moreover, the City did not establish either that granting this permit would increase its water treatment costs or that denying

11

it would reduce them. Instead, substantial evidence in the record demonstrates that Lake Waco's water quality is affected generally by discharge from a number of different sources, including the City's own wastewater treatment plants.

The City vigorously contends that it is an "affected person" because there is no dispute that the dairy could potentially discharge phosphorus into the watershed. The question before the Commission, however, was whether to grant the City "affected person" status with respect to the particular permit at issue. The permit under consideration did not seek to authorize a new dairy, but to modify the operations of an existing one—one that presumably was already discharging some amount of phosphorus into the watershed. The Commission determined that granting this permit would have an overall beneficial environmental impact and therefore would not adversely affect the City. This decision was within their discretion and was supported by substantial evidence. *See Collins*, 94 S.W.3d at 882-83. We find substantial evidence in the record to support the Commission's determination that the City is not an "affected person" for purposes of this permit application and therefore its decision to deny the City's hearing request.

The City argues on appeal that the Commission's decision violates notions of due process and fair play. When analyzing a due process claim, we first determine whether the complaining party has a liberty or property interest that is entitled to pre-deprivation procedural protection. If so, we must then determine what process is due. *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). Even assuming the City has the requisite interest, we hold the City received all the process it was due. We measure the process due using a flexible standard that depends on the practical requirements of the circumstances. *Id.* at 930 (citing *Mathews*

12

*v. Eldridge*, 424 U.S. 319 (1976)).  This involves balancing (1) the government's interest, including the fiscal and administrative burdens of additional or substitute procedural requirements, (2) the private interest that will be affected by the official action, and (3) the risk of an erroneous deprivation of such interests by the actual procedures used.  *Id.*  The City filed a request for a contested case hearing with evidence and exhibits.  It participated in a public meeting to address its request for a hearing.  The Commission considered the request, the arguments made in the Office of Public Interest Counsel's response, and the executive director's response.  After considering the arguments and evidence, and applying the pertinent statutes and regulations, the Commission made a decision. Although the City disagrees with that decision, it "was afforded ample opportunity for [its] concerns and request to be heard." *See Collins*, 94 S.W.3d at 884.

## CONCLUSION

There is substantial evidence in the record supporting the Commission's decision to deny the City's request for a contested case hearing.  We therefore affirm the district court's judgment affirming the Commission's order.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton;
   Dissenting Opinion by Justice Patterson

Affirmed

Filed:  September 17, 2010

13